**UNITED STATES of America,**
**Plaintiff,**

v.

**AMERICAN PACKING CORPORATION,** a corporation, William Schwartz, Samuel Goldberger, Emanuel Kohn, Sol Schwartz, Adolph Kaplan, Celina Kaplan, Robert O. Bayne, Max Gerstl and Henry Herzfeld, Defendants.

**Civ. A. No. 132-52.**

United States District Court.
D. New Jersey.

Nov. 5, 1954.

Marvin C. Taylor, William M. Lytle, Joe F. Nowlin, Aubert C. Dunn, Washington, D. C., for plaintiff.

Hudspeth & Harris, Harry Harris, I. Charles Lifland, Michael F. Reilly, Jersey City, N. J., Joseph F. Walsh, Newark, N. J., for defendants.

MEANEY, District Judge.

The United States of America instituted the present suit against the defendants for damages and forfeitures to which it alleges it is entitled. The Government asserts that the defendants conspired to file or caused to be filed false claims against it, which claims were paid, and that by reason thereof the Government suffered damages and is entitled to the twofold remedy of forfeitures in the sum of $2,000 for each fraudulent claim and an amount equal to double the damages sustained by reason of the payment of the fraudulent claims.

A motion for summary judgment was filed by the plaintiff against the American Packing Corporation, William Schwartz, Samuel Goldberger, Emanuel Kohn, and Adolph Kaplan, on the ground that in prior criminal proceedings these five defendants entered pleas of guilty to an indictment (No. 114–51) charging them with conspiracy to defraud the United States, and judgments of conviction were entered against these five defendants. The conspiracy set forth in the indictment to which they pleaded guilty is that which is included in the complaint in this civil action. Charged in the same indictment were Celina Kaplan, Robert O. Bayne, Max Gerstl, Henry Herzfeld, and John F. Jones, the latter not a defendant in the instant suit. After the entry of the aforementioned pleas the indictment was dismissed as to the defendants other than the five who pleaded guilty. A motion for summary judgment based on the pleas to the indictment was denied by this court, 113 F.Supp. 223, on the ground that while the plea constituted a judicial admission of participation in the overall conspiracy, it was an evidential admission as to the overt acts charged in the indictment and hence the Government was put to its proof in the instant civil action.

At the opening of the trial the defendant, Henry Herzfeld, was granted a separate trial. The defendant, American Packing Corporation, which was in the hands of a trustee in bankruptcy since 1949, filed no answer and made no appearance by counsel. The defendant, Emanuel Kohn, filed an answer but did not appear, nor was he represented by counsel during the trial. Original counsel for Kohn (Mr. Samuel I. Kessler) produced a letter written by Kohn in which Kohn consented to Kessler's withdrawal from the case and agreed to submit to the judgment of the court without appearance personally or by counsel. At the conclusion of the plaintiff's case the

complaint was dismissed as to Sol Schwartz for failure of proof of his participation in the fraudulent practices alleged in the complaint.

With this preliminary statement the court proceeds to a discussion of matters pertinent to the findings of fact and conclusions of law hereinafter to be made.

## Legal Discussion

■ It may be well at this point to discuss the question of possible forfeitures and damages and determine the principles which will affect the conclusion ultimately to be arrived at. With respect to forfeitures, the basis for such claims rests on section 3490 of the Revised Statutes, 31 U.S.C.A. § 231. In the event that there is proof which satisfies the court that any of the acts prohibited by section 5438 of the Revised Statutes, 31 U.S.C.A. § 231, 18 U.S.C.A. §§ 286, 287, have been done, then there is no question that forfeiture ensues. In the instant case the further question to be decided is whether for the 98 contracts which are the subject matter of the suit there shall be one forfeiture of $2,000, or whether the Government is entitled to a $2,000 forfeit for each of the 98 contracts involved. The complaint in each count alleges that the defendants made or caused to be made, or presented or caused to be presented for payment or approval, a claim upon or against the United States which was known to them to be false, fictitious or fraudulent, and for the purpose of obtaining the payment or approval of the said claim, made, used or caused to be made or used, a false, fictitious or fraudulent bill or invoice. It further alleges that the defendants agreed, combined and conspired together and with other persons to defraud the United States and/or the Department of the Army, or officers thereof, by obtaining, or aiding to obtain, the payment or allowance of the said false, fictitious or fraudulent claim. With reference to the alleged conspiracy, it may be contended that there is no proof that there was a separate conspiracy involving the individual defendants for each contract.

But if there was an overall conspiracy affecting each of the contracts in question, the incidence of the fraud on individual contracts may be shown by proof of acts with relation to those contracts which resulted in the presentation of separate and fraudulent claims. It would seem then that if false claims were presented for each of the 98 contracts, the Government would be entitled to 98 separate forfeitures of $2,000 each. That the defendant company would be responsible for the forfeitures in such case is patent. Now comes the problem of whether this liability extends to any or all of the individual defendants. It is the contention of the plaintiff that the individual defendants entered into an agreement or combination and conspired to defraud the Government of the United States by obtaining, or aiding to obtain, the payment or allowance of false claims in each of the 98 contracts, and further that they actually obtained or aided to obtain such payment in each individual contract. If this be sustained by the proof, then the individual defendants would be jointly and severally liable with the defendant corporation for the forfeitures, and this whether they personally played a part in or even knew of *all* the acts which had as their ultimate object the making or causing to be made the fraudulent claims alleged in the complaint. Their conscious participation in any of the fraudulent activities would be sufficient to render them liable.

These principles are borne out by the case of U. S. ex rel. Marcus v. Hess, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443. In the Third Circuit, in the case of U. S. v. Rohleder, 157 F.2d 126, 131, Judge McLaughlin writing for the Court of Appeals in the application of the doctrine of the Hess case, points out that in the case of 56 P.W.A. projects, forfeitures were declared on each of the individual projects, for each of which there was a contract. True, he did limit recovery of the penalties to the contracts, in contradistinction to the many false forms filed in each contract, which, as in the Hess case, were "absorbed into their respective

projects." See, further, Faulk v. U. S., 5 Cir., 198 F.2d 169; U. S. v. Grannis, 4 Cir., 172 F.2d 507, in support of the construction of the False Claims Statute which allows separate forfeitures for each definite and individual violation of the Act.

■■ As to the matter of damages, the language of the statute is explicit and allows recovery of double the amount of damages which the United States may have sustained by the doing or committing such act. The questions that arise in the subject of damages are: Were there damages, and if so, what is the measure of such damages, and how are they to be assessed? Let it be stated at the outset that the plaintiff concedes that because of the nature of the evidence and the character of the frauds alleged to have been committed by the defendants, it is impossible to figure accurately the exact amount of loss sustained by the United States Government. That there was damage to the United States is evident according to the plaintiff's theory, from the testimony of substitution of inferior products for those called for in the contracts. Should the findings of fact sustain this contention, the method of adjudging the amount of damages becomes important. Because of the complexity of the methods used in fulfilling the contracts, and the fact that all of the contracts were of a similar nature and to be filled by the same contractor and were actually filled by a series of uninterrupted activities in the same plant, this court feels and has ruled that a lump sum in damages might be allowed covering all of the losses resulting to the Government from the use of improper material in filling all of the contracts, without regard to the loss from each individual contract, should damage be shown. In other words, the sum total of all the improper material furnished in fulfilling the contracts may be used in measuring the amount of loss to the Government rather than the individual losses in each contract, since these latter are almost incapable of determination. No other formula could be arrived at because of the impossibility of showing exactly what meat went into each package of processed meats used for the contracts in question by reason of the system used by the defendant company in processing carcasses and packaging the processed meat. The ruling of this court, in this instance, is based on the principle set forth in the case of Bigelow v. RKO Radio Pictures, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652, and the cases therein cited. The Supreme Court held that difficulty of ascertainment alone could not defeat recovery of damages if a just and reasonable estimate of the damage based on relevant data can be made. Speculation and guesswork may not be the basis for establishing the amount of damages; but given evidence of material and relevant facts, in a case where more precise information is prevented by the acts and wrongdoing of the party charged, then an appraisal of the resultant damage may be made from the available proof " 'probable and inferential as well as direct and positive' ". Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 251, 75 L.Ed. 544. The risk of uncertainty must be borne by the party through whose fraud or wrongdoing the damage was created. Otherwise there would be every inducement for such party to preclude recovery by using skill and foresight in falsifying or destroying or failing to keep records, and in resorting to such other skulduggerous practices as might prevent accurate measure of damages.

■ If damage has been shown, it seems to this court that the most practical and at once the most equitable method of determining it is to ascertain the difference between the value of what the Government was entitled to receive under the contracts and the value of what actually it received. Simple as this may seem, there are many involvements which complicate the issue. And so in order to make a just and reasonable estimate from available data, the court adopts as a measure of damages the price differential between the lowest market quotations for grades of meat which

would have met the requirements of the contracts and the highest market quotations for the types of meat actually furnished, the quotations being from the same authoritative market reports in each instance and for the same days and the same quantities. These market reports are in evidence. The defendants' contention that they are entitled to show and be credited with the amounts they allege they actually paid for the meats furnished on the days in question seems immaterial to the issue and without merit. Whatever they may have paid for material which did not meet contract requirements and which may have been in excess of the currently quoted prices has nothing to do with what the Government allegedly suffered by reason of the substitution of inferior products. The prices in the market quotations are in the main for carcasses. The method of computation using these prices instead of prices of processed, packaged meat is favorable to the defendants in any attempt at fair and reasonable approximation of damages. Moreover, it would be impossible to ascertain even an approximate differential between the two types of processed products, though if possible of discovery, such differential would be even greater than that which results from use of carcass quotations. Therefore whatever uncertainty evolves from this manner of figuring the damages redounds to the benefit of the defendants who should have no quarrel on that score.

For clarification, certain other matters may now require brief mention. In determining the character of the carcasses used in the plant for processing for the Army contracts in question, the court weighed the evidence and concluded that in its interpretation of the records of the defendant corporation with symbols used thereon, it must give greater weight to the testimony of those who worked and made up report sheets rather than to the self-serving and largely unsupported statements of the corporation's owners and officers. It further had in mind the evidential admissions made in the plea of

guilty which was entered to an indictment charging conspiracy to defraud the Government, which indictment set forth as overt acts many of the allegations which are the bases of the instant action. It is true that the plea was entered by only American Packing Corporation, Goldberger, Kaplan, Kohn and William Schwartz, and the indictment on motion of the United States Attorney was dismissed as to other defendants. What motivated the dismissal, whether a question of policy or unavailability of proof at the time, or other considerations, is immaterial provided the proof in the case at bar be sufficient to establish the Government's contention as to participation in the conspiracy by all of the defendants in this action. But as against those who pleaded guilty, the admissions supported by independent testimony have cogent force in affecting the findings of fact. And if it be shown that the other individual defendants actually agreed and acted in concert with them to defraud the Government, the same cogency will attach to them.

The defendants during the trial with long continued instancy brought out evidence of acceptance by the Army of the questioned products. But the character of the examination at the ultimate point of acceptance proved to be so casual as to be a practical nullity as evidence of compliance with the contract when weighed against the evidence contradictory thereof.

Where the records themselves show seeming inconsistencies in each such case, the record most favorable to the defendants was accepted and any claim for damage abandoned.

In attempting to decide one of the most important factors entering into the assessment of damages (the nature of the carcasses used for processing), the court was confronted with irreconcilable, conflicting testimony. The two witnesses for the defense were two officers of the corporation who had already admitted participating in a conspiracy to defraud the Government and had evidentially admitted the substitution of inferior ma-

terial for that required by the contract. Their testimony at this trial constituted a denial of what they had already admitted in the criminal proceedings brought against them, the subject of which was the same as that of the present action. In so far as the available records are concerned, their interpretation differed completely from that given by the Government witnesses, particularly the witness Steve Kowalski who worked on the carcasses used for the filling of the contracts in question. His duties were those of a cutter, in addition to which he kept for the records of the corporation a daily production sheet of all the carcasses cut into forequarters and hinds, which sheet sets forth the nature of the carcasses, whether from steers, heifers, cows or bulls. The testimony of other witnesses and cross-checking with other material records (such as invoices, kill sheets, receipts, etc.) were urged by the plaintiff as supporting Kowalski's testimony as well as giving independent proof of the Government's contentions as to the carcasses. There was special disagreement as to certain symbols used in classifying animals, the defense asserting that these symbols referred to quality, while the plaintiff insisted that the same designations (A, AA, and B) referred to the kind of animal rather than its quality. Again each party tried to substantiate its position by reference to other testimony and exhibits, the plaintiff, for instance, stressing the evidence that the documents not prepared by Kowalski bore out his testimony that the symbols related to kind and not quality in so many instances that it could hardly be a continual coincidence. Further, the Government makes stressful reference to the fact that the listings in so many documents of the corporation relate to B high good or C low good as the nomenclature for quality or grade, and not the symbols above mentioned. The defendants claim that broker's invoices call animals furnished "bulls or cattle" and insist that the designation "cattle" signified steers, while the Government tracing the animals included in these invoices asserts that the receipts and kill sheets show that all animals included as cattle in this type of invoice were actually bulls. In this connection it may be well to point out that the court's recollection and reexamination of the evidence show that there were but twenty-six instances of variation between the kill sheets and the invoices which specified the kind of animal the carcasses of which were used for these Army contracts. The overwhelming majority of the results of contrasts and comparison between the invoices and the kill sheets showed agreement as to cows, heifers and bulls.

As to the prevalence of what are called bologna bulls (in contradistinction to butcher or choice or commercial or good bulls) in market reports, the evidence seems to point out that this type of bull is the common type on the market, the others being far less plentiful.

While these do not exhaust the matters considered by the court in trying to arrive at its factual conclusions, yet they are suggestive of the mass of evidence sifted and appraised.

With the foregoing discussion in mind, the court makes the following findings of fact and conclusions of law.

### Findings of Fact

1. This is a civil action brought by the United States of America under the provisions of sections 3490 and 5438, Revised Statutes, 31 U.S.C.A. § 231, 18 U.S.C.A. §§ 286, 287. Jurisdiction of this court is given in section 3491, Revised Statutes, 31 U.S.C.A. § 232.

2. Defendant, American Packing Corporation, at the times mentioned in the complaint herein, was a corporation organized and existing under the laws of the State of New Jersey.

3. At such times the defendant, William Schwartz, was president of the said American Packing Corporation.

4. At such times defendant, Samuel Goldberger, was vice-president of the American Packing Corporation.

5. At such times defendant, Adolph Kaplan, was vice-president of American Packing Corporation.

6. At such times defendant, Emanuel Kohn, was vice-president and secretary of said American Packing Corporation.

7. At such times defendants, Celina Kaplan, Robert O. Bayne, and Max Gerstl, were employees of said American Packing Corporation.

8. At such times none of the defendants was a person in the military or naval forces of the United States or in the militia called into or actually employed in the service of the United States.

9. The Department of the Army, a division of the Department of Defense of the United States, entered into certain contracts with the defendant, American Packing Corporation, according to the terms of which the defendant corporation was to furnish meat for use and consumption by the Armed Forces of the United States. These contracts to the number of 100 are set forth in the complaint.

10. There was competitive bidding, the 100 contracts were awarded in most instances to the defendant, American Packing Corporation, and the balance to Ben Grunstein & Sons Company.

By way of award of the contracts referred to, purchase orders were issued to the successful bidders which set forth the terms and conditions of the purchase, with a description of the products and the methods of their processing by reference to certain specifications which were made part of the contract.

11. For each of the contracts in its name, the defendant, American Packing Corporation, presented an invoice to the United States of America which certified that the bill was correct and just and that all conditions of the purchase orders were complied with. In the case of those contracts mentioned herein which were awarded to the Grunstein Company, the meat was furnished by the defendant corporation which was paid for by the Grunstein Company. The Grunstein Company in turn was caused to present a similar invoice by the defendants herein.

12. These invoices with their certifications were relied upon by the Department of the Army in preparing vouchers which incorporated by reference the certificate of the invoices made or caused to be made by the defendant corporation. The vouchers with the incorporated certification constituted claims against the United States for payment of money.

13. Relying on these claims for payment, the United States paid each of them in full.

14. With the exception of one contract set forth in count 99 of the complaint, which was for veal sides, all of the contracts mentioned in the complaint were for frozen boneless beef. In the specifications which were an integral part of the contract, provision was made for inspection by Army inspectors of the carcasses to be used, and also of the boning, processing, boxing and freezing of the meat of said carcasses.

15. The contract specifications called for use of carcasses of steers or heifers only which were to be equal to grade "good" as defined by the United States Department of Agriculture. Carcasses of grades B and C were required for processing in some of the contracts, and Army specifications described grade B as equal to the top half of grade "good" as heretofore mentioned, and grade C as equal to the bottom half of such grade "good."

16. All contracts, through the specifications, called for placing of the processed meat in an approved freezer within four hours after packing.

17. Throughout the period of performance of the contracts, the individual defendants knowingly combined and cooperated in a course of conduct aimed at defrauding the plaintiff United States of America. The activities which constituted such course of conduct consisted of supplying products of a different and lower quality than that called for by the contracts between the plaintiff and the corporate defendant, and the filing of fraudulent claims therefor. The means used to accomplish their common purpose

included bribery of Army inspectors, circumvention of proper, required Army inspection by various means such as conducting operations in the absence of inspectors, unauthorized use of official stamps on animal carcasses, and changing and mislabeling of boxes. Further acts to effect their agreed end were the furnishing of meat from carcasses of bulls and cows not contemplated in the contracts, and furnishing of meats of a lower grade than that set forth in the specifications of the contracts. In addition to these variations from the standards and requirements of the contracts, there were deviations from other requisites affecting methods of freezing the meat products, the places and conditions of processing of carcasses, and general misrepresentation as to compliance with the terms of the contracts.

18. All of the individual defendants were aware that the activities above set forth were in violation of the terms of the contracts between the defendant corporation and the United States of America, and they engaged in such activities individually and in concert for the purpose of defrauding the plaintiff herein.

19. The participation of the individual defendants in the purpose common to all of them to defraud the United States Government is indicated by their acts and declarations, though each of the defendants may not have known each and every step taken by the other defendants to effectuate the fraud.

20. William Schwartz was the president of the defendant corporation and active in the conduct of the corporation's business. He signed false certificates and paid money to an Army inspector to induce him to neglect his duties, and was in touch with all operations involved in the contracts in question.

21. Emanuel Kohn was a vice-president and secretary of the defendant corporation and handled much of the supervision and control of the business. He signed false certificates and paid an Army inspector to overlook infractions of the contracts. He was aware of and participated in the general activities of the corporation. He entered no defense other than the denial contained in his answer.

22. Adolph Kaplan was an officer of the corporation familiar with the setup of the corporation. Principally he engaged in buying of cattle to be slaughtered and used at the corporation plant. At times he exercised supervision over the activities at the plant, and gave directions affecting the Army contracts. He was aware of and participated in the filling of the contracts in question.

23. Samuel Goldberger was an officer of the defendant corporation. His operations were conducted at the corporation's plant and he participated in supervising employees and instructing them in means and methods used in filling the contracts in issue. He was familiar with the nature of the meat used and such substitutions as were made.

24. Celina Kaplan, wife of Adolph Kaplan, vice-president of the defendant corporation, was an employee of the corporation. Her duties were concerned with the records affecting the processing of meat for Army as well as other contracts, the shipping of the processed meat to the freezer, and the shipments to the Army. She prepared invoices to be submitted to the Army and was generally familiar with the conduct of the business. In addition to her duties as she outlined them, and in spite of her denials of knowledge of and participation in any attempt to defraud the United States, the evidence indicates that she assumed in some instances managerial activities and control. This was particularly true with reference to processing and freezer records. She was continually in touch with plant operations and actively engaged in activities which resulted in the defrauding of the United States on the contracts herein mentioned.

25. Max Gerstl was an employee of the defendant corporation, but in no minor capacity. He took part in acts which were concerned with such contributions to defraud the Government as incorrect marking of processed products, defeating of Army inspection, supervi-

sion of employees processing meat on days when there was no Army inspection, supervision of employees engaged in the alteration of markings on Army beef, substitution of stamped box tops for plain box tops on uninspected meat. He was evidently familiar with the course of action throughout the fulfilling of the Army contracts and participated effectively therein.

26. Robert O. Bayne was an employee of the defendant corporation. He was the foreman in charge of packing on the sixth floor where Army beef was processed, and as part of his duties kept certain records. He instructed other employees to perform certain work in a manner calculated to defraud the plaintiff. Meat not in conformity with contract requirements was by his direction used in filling the contract orders. Operations were carried on in response to his orders which circumvented the inspection called for in the contracts. His activities were such as to show familiarity with the scheme to defraud and community of operation in the fraud on the Government.

27. The claims for payment set forth in the various counts of the amended complaint (with the exception of counts 96 and 98 which were dismissed for lack of proof) with the certificates of performance of the various contracts and of compliance with all conditions thereof, were false, and known by defendants, American Packing Corporation, William Schwartz, Samuel Goldberger, Emanuel Kohn, Adolph Kaplan, Celina Kaplan, Robert O. Bayne and Max Gerstl to be so.

28. The substitutions of meat consisted of using cow and bull meat for steer and heifer meat, and miscellaneous cuts not of the grade specified for delivery to plaintiff.

29. Analysis of the records of the defendant packing corporation shows that for steer or heifer meat, cow meat to the amount of 1,093,913½ pounds was substituted.

30. Analysis of market reports throughout the period covered in the complaint indicates that the average difference between the price of steer and heifer meat called for by the contracts and the cow meat actually furnished was, as near as can be approximated, 13.9 cents per pound, or a total of $152,053.98.

31. With reference to bull meat furnished under the contract instead of the steer and heifer meat called for, analysis of the corporation's records shows that 684,843 pounds of bull meat were so used.

32. Analysis of market reports through the period covered in the complaint establishes 16.3 cents per pound as a fair differential in price between steer and heifer meat and bull meat, or a total of $111,629.41.

33. Analysis of the corporation's records shows delivery of miscellaneous cuts of meat instead of meat from steer or heifer carcasses, in the amount of 115,201½ pounds.

34. Comparison of prices for miscellaneous cuts used in filling contracts in question with meat called for in the contracts indicates that 14.76 cents per pound is a fair price differential, or a total of $17,003.74.

35. These amounts, totaling $280,687.13, represent a fair and reasonable measure of the damage sustained by the plaintiff by reason of the hereinbefore described acts of the defendants acting in concert knowingly to defraud the Government.

36. One count of the complaint related to veal which the evidence indicates was frozen, thawed and refrozen, a situation which rendered the meat unacceptable under the terms of the contract. There is no measure of computation of damages to the United States in money other than that supplied by the forfeiture provisions of the statutes upon which the plaintiff's action is based.

37. In the case of each and every contract except the two concerning which this court found insufficient proof, the evidence shows that there was a violation of the terms and requirements of the contract, whether by substitution of

different grades of meat from those set forth in the purchase orders, by deliberate avoidance of inspection by various means hereinbefore referred to, or by failure to adhere to requirements for freezing, packaging and shipment.

38. For each and every contract with the two exceptions mentioned, false claims were filed and paid and the Government of the United States was defrauded.

### Conclusions of Law

1. This court has jurisdiction over the parties and the subject matter of the suit.

2. The defendant, American Packing Corporation, presented false claims against the United States of America in the case of each and every contract mentioned in the amended complaint, except counts 96 and 98, knowing the said claims to be fraudulent and false and with full knowledge of the nature of the frauds perpetrated.

3. The defendants, American Packing Corporation, William Schwartz, Samuel Goldberger, Emanuel Kohn, Adolph Kaplan, Celina Kaplan, Robert O. Bayne and Max Gerstl, caused to be made and presented the said false claims and conspired to defraud the Government of the United States by aiding to obtain the payment of said false claims.

4. The said false claims were presented and made and caused to be presented and made, for payment and approval to and by persons in the civil, military or naval service of the United States, and payments were made on said false claims.

5. In connection with each of these false and fraudulent claims, the defendant, American Packing Corporation, made and presented invoices which were false and fraudulent by reason of the fact that they contained a certificate of an officer of said corporation in its behalf which certified that the bill was correct and just and that all conditions of purchase had been complied with when in fact said officer acting on behalf of the defendant corporation knew that the bill was not correct and just and that the contract had not been fulfilled according to its conditions and obligations.

6. The defendants, American Packing Corporation, William Schwartz, Samuel Goldberger, Emanuel Kohn, Adolph Kaplan, Celina Kaplan, Robert O. Bayne and Max Gerstl, caused to be made and presented the said false and fraudulent invoices, and conspired to cause to be made and presented the said invoices, knowing the same to be false and fraudulent.

7. Each of the defendants separately and distinctly violated sections 3490 and 5438 of the Revised Statutes of the United States.

8. The plaintiff, United States of America, is entitled to recover from the defendants, American Packing Corporation, William Schwartz, Samuel Goldberger, Emanuel Kohn, Adolph Kaplan, Celina Kaplan, Robert O. Bayne and Max Gerstl, jointly and severally, the sum of $2,000 by way of forfeiture for violation of the False Claims Statute in the case of each of the contracts hereinbefore referred to, excepting those concerning which the claim of the Government has been dismissed or for which no adequate proof was adduced—a total of 96 contract violations with a resultant forfeiture of $192,000.

9. The plaintiff, United States of America, is entitled to double the amount of damages it sustained by reason of the commission of the acts described in violation of the False Claims Statute or twice the sum of $280,687.13, amounting to $561,374.26, jointly and severally against defendants, American Packing Corporation, William Schwartz, Samuel Goldberger, Emanuel Kohn, Adolph Kaplan, Celina Kaplan, Robert O. Bayne and Max Gerstl.

10. The plaintiff, United States of America, is entitled to recovery jointly and severally against defendants, American Packing Corporation, William Schwartz, Samuel Goldberger, Emanuel Kohn, Adolph Kaplan, Celina Kaplan, Robert O. Bayne and Max Gerstl, of the total sum of $753,374.26.

Since the conclusion of the case one defendant, Emanuel Kohn, died. An application was made by the Government for substitution of Frederick H. Samuels, administrator of the estate of Emanuel Kohn, deceased (so appointed July 1, 1954), as party defendant in place of Emanuel Kohn who died April 25, 1954. This application was granted and an order to that effect filed with the clerk of this court October 25, 1954.