UNITED STATES of America,
Plaintiff,

v.

BEN GRUNSTEIN & SONS COMPANY
et al., Defendants.

Civ. A. No. 888–51.

United States District Court
D. New Jersey.

Dec. 19, 1955.

Supplemental Opinion Jan. 17, 1956.

See also 127 F.Supp. 907.

Raymond DelTufo, Jr., U. S. Atty., Newark, N. J., by William M. Lytle, Dept. of Justice, Washington, D. C., E. Leo Backus, Dept. of Justice, New York City, for plaintiff.

Kasen, Schnitzer & Kasen, by Morris M. Schnitzer, Newark, N. J., for defendants Ben Grunstein & Sons Co., William Grunstein, James Albrizio, Albert Albrizio, Lawrence G. Foster, Milton Halperin and Werner Schott.

Robert R. Dann, New York City, for defendants Arthur Grunstein and Benjamin Grunstein.

HARTSHORNE, District Judge.

Defendants move, under Fed.Rules Civ.Proc. 34, 28 U.S.C., to inspect and copy certain portions of the minutes of the Grand Jury which found Indictment No. 65-51 filed in this Court February 20, 1951, against several persons, including William Grunstein and Ben Grunstein & Sons Company, two of the defendants in this civil proceeding. Such indictment also refers to the other defendants in this proceeding, not making them defendants therein, and alleges that all of them were parties to the very conspiracy, which is now a part of the present civil proceedings brought by plaintiff, the United States, under the False Claims Act, 31 U.S.C.A. § 231 et seq., 12 Stat. 698. To Count 1 of this indictment, involving such conspiracy, the two above named defendants pleaded guilty, and have been sentenced. As to the others, the proceedings under such indictment have long since been terminated. Defendants ask, not for a disclosure of the entire minutes, including those as to the deliberations and other action of the Grand Jurors themselves, nor even as to all the testimony adduced before that body, but only as to the minutes covering the testimony, as to matters relevant to the case at bar, of either any of the nine defendants in these proceedings, or of any other witnesses who are to testify in these proceedings, on the part of either the plaintiff Government or the defendants.

Defendants allege, as the necessary "good cause" for such application, the fact that plaintiff has present access to these entire minutes, thus giving plaintiff a great tactical advantage over defendants, who lack same. This is because, if any of the above individuals testified before the Grand Jury in a way which would be helpful to the Government, the Government knows it, and can use it to refresh their memory if necessary, and without any check thereon by defendants as to any qualifying interpretations of such testimony. Au contraire, if any of such individuals have testified before the Grand Jury in a way helpful to the defendants, the defendants will not know it, and therefore cannot use it to their equivalent advantage.

Basically, therefore, the issue here is, as to how to coordinate justly the policy of the Federal Rules of Civil Procedure for free, full discovery before trial for both parties, with the traditional policy as to the secrecy of Grand Jury proceedings.

Our highest court has already alluded to this necessary coordination, though without specific regard to Grand Juries. In Hickman v. Taylor, 1947, 329 U.S. 495, 501, 67 S.Ct. 385, 389, 91 L.Ed. 451, that Court said: "The way is now clear, consistent with recognized privileges, for the parties to obtain the fullest pos-

sible knowledge of the issues and facts before trial. * * * Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation * * * reducing the possibility of surprise." This rule has been applied similarly in states which have adopted the Federal Rules in substance. Schwartz v. Public Service Coordinated Transport, N.J.Co.Ct.1949, 64 A.2d 477.

But, as the United States Supreme Court, says, this discovery must be "consistent with recognized privileges", and one of these privileges is that of the Grand Jury as a public institution, as well as of the witnesses that appear before it. Since there is no question as to the relevancy of the evidence which is sought to be discovered, the sole question thus is, as to the extent of this privilege of secrecy as to the Grand Jury minutes.

■ Again our highest court has spoken. In United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 234, 60 S.Ct. 811, 849, 84 L.Ed. 1129, that Court, after stating that "Grand jury testimony is ordinarily confidential", adds "But after the grand jury's functions are ended, disclosure is wholly proper where the ends of justice require it." Since, as seen above, the Grand Jury's functions have here ended, as to the situation involved in the present civil proceedings, the specific question is, whether "the ends of justice require" the disclosure asked. This necessitates a consideration not only of the situation of the parties to the present proceeding, but of the effect upon public policy generally, and upon the witnesses themselves, now and hereafter, of the disclosure asked.

Looking at the parties themselves, the ends of justice would clearly call for a discovery of what plaintiff knows of

this relevant testimony, to defendant, in order that the parties may be placed on a parity. So we turn to the question as to how far the above policy of secrecy, for the protection of both the public and the witnesses, countervails this unbalanced situation between the parties themselves.

This traditional secrecy doctrine clearly makes basically secret the deliberations and other action of the Grand Jurors themselves, when acting as such. This doctrine has indeed been incorporated in the Federal Rules of Criminal Procedure, F.R.Cr.P. 6(e), 18 U.S.C.,[1] which, while applicable primarily to criminal proceedings, sets forth in addition that a lawful disclosure may be had only by court order.

Again we find that the specific bases for this doctrine of secrecy have already been laid down by authorities controlling here. In U. S. v. Rose, 1954, 215 F.2d 617, 628, the Court of Appeals for the Third Circuit, in approving of United States v. Amazon Industrial Chemical Corp., D.C.Md.1931, 55 F.2d 254, 261, summarized these reasons for secrecy as follows:

"(1) To prevent the escape of those whose indictment may be contemplated; (2) to insure the utmost freedom to the grand jury in its deliberations, and to prevent persons subject to indictment or their friends from importuning the grand jurors; (3) to prevent subornation of perjury or tampering with the witnesses who may testify before grand jury and later appear at the trial of those indicted by it; (4) to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes; (5) to protect innocent accused who is ex-

---

1. "Disclosure of matters occurring before the grand jury other than its deliberations and the vote of any juror may be made to the attorneys for the government for use in the performance of their duties. Otherwise a juror, attorney, interpreter or stenographer may disclose matters occurring before the grand jury only when so directed by the court preliminarily to or in connection with a judicial proceeding * * *. No obligation of secrecy may be imposed upon any person except in accordance with this rule."

onerated from disclosure of the fact that he has been under investigation, and from the expense of standing trial where there was no probability of guilt." 215 F.2d at page 628.[2]

Since both the Grand Jury's deliberations and the trial of the indictment emanating therefrom have now terminated, and here in convictions, none of the above reasons for the rule of secrecy now apply to the present application, save "(3) to prevent subornation of perjury or tampering with the witnesses who may testify before grand jury and later appear at the trial of those indicted by it" and "(4) to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes", not only at present, but perhaps more importantly, in the future. As to the first of such reasons for secrecy, it should be borne in mind that this same reason applies to every possible witness known to one party in a civil proceeding, whose name is desired by the other, a form of discovery clearly requisite. For the Federal Rules of Civil Procedure are based on the conclusion, that this possibility is not as great a danger as is the danger of surprise, which habitually resulted previously, when such discovery was generally refused. That this conclusion is sound, is fortified by the fact that the party who already knows of this witness can, by these very same discovery rules, see that this witness' story is not tampered with, by having his depositions taken and sworn to, before he is subjected to any such possible pressure from the other side. As to reason (4), supra, investigation by the Grand Jury into criminal activities is so important to the body politic, that witnesses as to such matters should not be discouraged, by fear of unnecessary pressures, if not violence, by others, from testifying before Grand Juries. On the other hand, the privilege attending such witnesses,

both for their own benefit and that of the body politic should not go so far as to invite possible perjury. This would be the case, were any such witness, from that very fact, to be free from any possible later inquiry as to his testimony before the Grand Jury in that regard. Here these witnesses are, on the one hand, the defendants themselves, and on the other hand, other witnesses, who may possibly, not surely, be called, either for plaintiff or defendants.

Considering the defendants themselves, their counsel have expressly represented to the Court that they will each and all take the witness stand on their own behalf in the present trial. Such being the case, that very action waives any possible claim of privilege on their own behalf, as to what they may have testified to in that regard before the Grand Jury. For no one can be permitted to testify only in part, as to what he has said or done, in regard to a particular transaction. He must not only tell the truth, but the whole truth, including prior possible admissions. Willard C. Beach Air Brush Co. v. General Motors Corp., D.C.N.J.1953, 118 F.Supp. 242, 247. Nor can public policy ask a broader privilege. For no witness before a Grand Jury can possibly expect, for similar reasons, that if he is later a witness in either a criminal or civil proceeding, based on the very transaction to which he has testified before the Grand Jury, that he will not be asked what he has previously admitted to be the fact concerning that transaction, whether on the street, in court, or before the Grand Jury. Thus such discovery will not unduly discourage "free and untrammeled disclosures" by witnesses to Grand Juries. Thus there is no sound objection to such discovery, necessary as between the civil parties, on the ground of protection of the individual witness or of the public. To the extent the defendants desire their own testimony "the sanctity of that which transpired before

2. See also the similar treatment of this matter by that recognized legal author-ity, the late Colonel Wigmore, in 8 Wigmore, Evidence, Sec. 2362.

the Grand Jury is hardly in question. In addition, such disclosure would not subvert any of the reasons traditionally given for the inviolability of Grand Jury proceedings." U. S. v. Rose, supra, 215 F.2d at page 630. In short, any defendant in these civil proceedings, or any other witness before the Grand Jury in this regard, who will definitely take the stand as a witness in the case at bar, should have disclosed to the defense his testimony before the Grand Jury in that regard.

Here it should be noted that the Grand Jury is an arm of the Court, not an arm of the plaintiff, the United States Government, which in the present civil case is acting through, not the Court, but its executive arm, the Department of Justice. "The Constitution itself makes the grand jury a part of the judicial process * * *. The proceedings before a grand jury constitutes 'a judicial inquiry' * * *." Cobbledick v. U. S., 1940, 309 U.S. 323, 327, 60 S.Ct. 540, 542, 84 L.Ed. 783. It therefore follows that, strictly speaking, defense is here seeking disclosure, not from plaintiff, but from the Court itself, which obviously should treat the parties alike in their rights to relevant testimony. It further follows that such testimony is not the "work product" of the plaintiff, protected from disclosure, as a limited privilege, by Hickman, supra.

We now turn to the witnesses before the Grand Jury, other than the defendants in the present civil proceedings, as to whom it is not now known whether they will testify at the present trial. If not called as witnesses at the trial, and the disclosure requested has been compelled, then the traditional Grand Jury secrecy policy will have been violated, with the ill effects, above noted, to both the public and the witnesses; and all without any necessity, so far as defendants here are concerned. This is because, if they are not called, then plaintiff Government has not taken unfair advantage of its knowledge of the nature of their Grand Jury testimony, insofar as same may have been favorable to

plaintiff, but only if same has been favorable to the defendant. But, if the latter is the case, defendants have long had another ready remedy. For while they cannot demand that plaintiff advise them of the civil witnesses it expects to use at the trial, they have the right to demand the list of witnesses, known to plaintiff, who know facts which are relevant to the case at bar. This list would of course include the names of all the witnesses in that regard before the Grand Jury. Then defendants, by examining these witnesses personally, or on deposition, can ascertain from them the very evidence they gave the Grand Jury. Indeed, after taking such discovery, if there is any real question still, for any unusual reason, as to what such witness may have told the Grand Jury, defendants can then apply to the Court, either to obtain a copy of such testimony for themselves, or perhaps better still, to have the Court itself inspect same, to see if same should, in fairness, be revealed to them.

This, it will be noted, is the application, to the limited privilege of Grand Jury secrecy, of the very principles and procedure already approved by our highest court, for application to the limited privilege of the legal profession's "work product" in Hickman, supra, 329 U.S. at page 511, 67 S.Ct. at page 393. In other words, this limited privilege should be preserved, as long as, but not longer than, it can be done with due regard to the requirements of justice between the parties. In short, with a ready remedy long available for defendants' lack of knowledge of the Grand Jury testimony of such witnesses, there is no "good cause" for the Court's furnishing this additional remedy, of the inspection of Grand Jury minutes, as to the testimony of certain witnesses, who may never be called on to testify at the trial at all.

However, if such witnesses, not expected to be called at the trial, are nevertheless ultimately so called, thereupon the discovery of their Grand Jury testimony should be given defendants, or to the Judge himself, to determine if de-

fendants should fairly see it, and this whether such minutes of his testimony have been called to the witness' attention before the trial or at the trial. United States v. Socony-Vacuum Oil Co., supra; U. S. v. Krulewitch, 2 Cir., 1944, 145 F.2d 76, 78, 79, 156 A.L.R. 337; U. S. v. Cohen, 2 Cir., 1944, 145 F.2d 82, 92; U. S. v. Remington, 2 Cir., 1951, 191 F. 2d 246, 250. However, this burden should be put upon the Judge, only if such Grand Jury testimony is reasonably short, and does not put an undue burden upon him and delay the trial. U. S. v. Alper, 2 Cir., 1946, 156 F.2d 222, 226.

Of course, as to unexpectedly called witnesses, in order to avoid surprise due to the recent production of the Grand Jury minutes of their testimony, the Court should defer the further examination of such witness by the defendants, if necessary to permit their proper use of such minutes for the impeachment of the witness, if he is called by plaintiff, or for his rehabilitation, if he is called by defendant, and such minutes have been used to impeach him.

It should be noted that the present situation differs substantially from (1) cases where the object of the inspection of the Grand Jury minutes is to attack the indictment,[3] or (2) where the Grand Jury minutes constitute the very gist of the criminal charge against the defendants, as in perjury cases,[4] or (3) where the indictment emanating from the Grand Jury in question is still alive,[5] or (4) where the discovery is asked, not as to the testimony of a particular witness or witnesses, but of the entire minutes of the Grand Jury proceedings, save the action of the Grand Jurors themselves.[6]

Here (a) the proceedings are civil, not criminal, (b) the criminal proceedings have long since been terminated, and (c) the discovery asked is quite limited. Indeed, as far as can be found, the only reported decision under circumstances generally similar to the present, is that of U. S. v. General Motors Corp., D.C.Del. 1954, 15 F.R.D. 486, and there the Court was asked to give, not a limited discovery, as here, but a complete sweep of the Grand Jury minutes. That Court's denial of such discovery can hardly be deemed inconsistent with the denial of discovery in the case at bar, save as to the testimony of those who definitely will be witnesses at the present trial.

An order may therefore be presented authorizing defendants to be furnished a copy of so much of the minutes of the above referred to Grand Jury testimony as includes that of (1) the defendants, who represent that they will take the stand in their own defense, and of (2) any other witnesses before such Grand Jury, who will definitely take the stand at this trial, as soon as such fact definitely appears.

### Supplemental Opinion

This Court has previously advised counsel that, before stating its opinion as to the proper measure of damages applicable in this False Claims Act proceeding, 31 U.S.C.A. § 231, covering over four hundred counts and asking judgment in the millions, it would prefer awaiting the conclusion of the evidence

---

3. U. S. v. Violon, C.C.S.D.N.Y.1909, 173 F. 501; U. S. v. Gouled, D.C.S.D.N.Y. 1918, 253 F. 242; U. S. v. Rubin, D.C. Conn.1914, 214 F. 507; U. S. v. Silverthorne, D.C.W.D.N.Y.1920, 265 F. 853; U. S. v. Morse, D.C.S.D.N.Y.1922, 292 F. 273; U. S. v. Herzig, D.C.S.D.N.Y.1928, 26 F.2d 487; U. S. v. Oley, D.C.E.D. N.Y.1937, 21 F.Supp. 281; Shushan v. U. S., 5 Cir., 1941, 117 F.2d 110; U. S. v. Papaioanu, D.C.D.Del.1950, 10 F.R.D. 517.

4. U. S. v. Rose, 3 Cir., 1954, 215 F.2d 617; U. S. v. Remington, 2 Cir., 1951, 191 F.2d 246; U. S. v. Owen, D.C.W.D. Mo.1951, 11 F.R.D. 371; U. S. v. White, D.C.N.J.1952, 104 F.Supp. 120.

5. U. S. v. Crolich, D.C.S.D.Ala.1952, 101 F.Supp. 782, and see cases in footnote 3.

6. Metzler v. U. S., 9 Cir., 1933, 64 F.2d 203; U. S. v. General Motors Corp., D.C. Del.1954, 15 F.R.D. 486; U. S. v. Morgan, S.D.N.Y.1948, unreported. Another motion of this nature is now pending before Judge Modarelli of this district in U. S. v. Procter & Gamble Co., D.C., 14 F.R.D. 230.

to see what measure of damages would most clearly do justice between the parties. However, defendants strongly urge that it might well be prejudicial to have the Government submit to the jury its projected schedules consisting of some 72 pages of foolscap, carrying well over 57,000 different mathematical items, summarizing the defendants' alleged liability to plaintiff upon one damage theory, were this damage theory thereafter to be stricken as unjust. For that reason, and because the plaintiff Government has now presented substantially its entire case as to defendants' alleged long-continued and carefully calculated frauds in circumvention of the meat inspection system of the United States Army, including bribery, the Court will now state its opinion as to the measure of damages which, under plaintiff's evidence, must be applied to achieve justice.

The only case in which the United States Supreme Court has passed on the measure of damages applicable in a False Claims Act proceeding, as in the case at bar, is United States ex rel. Marcus v. Hess, 1942, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443. Here our highest court devotes the bulk of its opinion to the discussion of other questions raised by that case, but it says at page 552 of 317 U.S., at page 388 of 63 S.Ct.: "We have examined the other contentions of the respondents [which include that as to the proper measure of damages] and approve of the disposition of them by the courts below. The judgment of the Circuit Court of Appeals is reversed and that of the District Court is affirmed." (Brackets this Court's.) The opinion of the Third Circuit in that case did not deal with damages. The opinion of the District Court, which was affirmed, did state the measure of damages. Consequently, the Supreme Court has thus approved and adopted the measure of damages as there stated.[1]

We therefore turn to the District Court opinion in Marcus, sub nom United States ex rel. Marcus v. Hess, D.C.W.D.Pa.1941, 41 F.Supp. 197, 214. The facts there were that the fraud was not, as in the case at bar, as to the faulty character of the materials received by the United States, but as to the price paid by the United States, due to the contract bids being too high, because of collusion. As to that, the District Court says: "'The damage to which the plaintiffs would be entitled would be measured by the difference between the contract price paid the contractor therefor in excess of the amount which the United States would have been obliged to pay for the same work, had there been open, competitive and uncontrolled bidding.'" Thereafter the Court restates the measure of damages as being: "the difference between the contract price and the fair and reasonable low bid * * *."

At first glance, and overlooking the fact that Marcus deals with a case of fraud as to the price paid the United States, the above principle sounds somewhat similar to the so-called out-of-pocket rule, which defendants contend should be here applicable. This rule is stated as the difference between the price paid by the person defrauded and the value of the property he has received in fact from the fraud doer. However, nowhere does the Court in Marcus require or permit proof of the value of what the United States there in fact received from the fraud doer. Instead of that factor, to be subtracted from the contract price, it substitutes the differing factor of "the fair and reasonable low bid", which the United States would have accepted had there been no fraud. In addition, this value of the goods actually furnished the United States in Marcus is the equivalent of the actual cost of such goods, plus profit, and this

1. In United States v. Rohleder, 3 Cir., 1946, 157 F.2d 126, the Third Circuit similarly held that the Supreme Court, in Marcus, by the approval of another principle laid down by the District Court in that case, had similarly adopted such principle.

cost of such goods is expressly rejected from consideration by the Court at page 216 of 41 F.Supp. So in applying the measure of damages the District Court rejects the out-of-pocket rule, and this rejection the Supreme Court says "We * * * approve * * *."

To make the matter even more clear, let us turn to Feeser, Inc., v. American Can Co., D.C.Md.1932, 2 F.Supp. 561, 569, where the Court clearly applies the out-of-pocket rule to a case where, as in Marcus, the fraud was as to the price paid by the defrauded purchaser.[2] While that was not a False Claims Act case, this is immaterial, the point being to see how the out-of-pocket rule is applied in a case where the fraud is, as in Marcus, as to the price paid. In Feeser, plaintiffs purchased tin cans from the defendant American Can Co., the purchase price according to the contract to be based on the price paid by American Can to the tinplate company, from whom American Can bought its tinplate. Plaintiffs claimed that American Can misstated this price to be higher than it was in fact. In Feeser the Court held that plaintiffs could *not* recover the difference between the price they paid and the lower price they would have paid had American Can not defrauded them, this being the very rule adopted by the District Court, and approved by the Supreme Court, in Marcus. In Feeser, decided before Marcus, on the contrary, the Court held plaintiffs entitled to recover " 'the difference between the price paid and the actual value of the goods' " received by the defrauded plaintiffs from the fraud doer. This, it will be noted, is specifically the so-called out-of-pocket rule. So our highest court, in Marcus, has specifically approved the refusal to apply the so-called out-of-pocket rule to a False Claims Act proceeding.

In addition, though this is not so important, it would really seem that in Marcus the Court applied the so-called benefit-of-the-bargain rule. This last, in a case where the fraud is as to the goods received by the person defrauded, as in the case at bar, as distinguished from where the fraud is as to the price paid by the person defrauded, as in Marcus, all agree, is the difference between the value of what plaintiff would have received, but for the fraud, and the value of what he did receive in fact, due to the fraud. This might be more simply stated as being the value of the property which the person defrauded would have received but for the fraud, less, as a credit, the value of the property which he has in fact received. Such being the so-called benefit-of-the-bargain rule in cases where the fraud is as to the goods, this rule, when applied to cases where the fraud is as to the price paid, as in Marcus, should be analogously, the difference between the price paid by the person defrauded, due to the fraud, and the price which he would have paid had there been no fraud. This is immediately seen to be "the difference between the contract price and the fair and reasonable low bid * * *", the very rule adopted in the District Court, in Marcus and approved in such case by our highest court.

Nor is the tenor of the rest of the Supreme Court's opinion in Marcus to the contrary. True, in discussing "double jeopardy" the Court said that the statute was to "afford the government complete indemnity for the injuries done it", 317 U.S. at page 549, 63 S.Ct. at page 387, and "the chief purpose of the statutes here was to provide for restitution to the government of money taken from it by fraud, and that the device of double damages plus a specific sum was chosen to make sure that the government would be made completely whole." 317 U.S. at page 551, 63 S. Ct. at page 388. Giving the Government "complete indemnity for the in-

---

2. The Maryland District Court there relied upon Smith v. Bolles, 1889, 132 U.S. 125, 10 S.Ct. 39, 33 L.Ed 279, and Sigafus v. Porter, 1900, 179 U.S. 116, 21 S.Ct. 34, 45 L.Ed. 113, common-law fraud actions, commented upon later.

juries done it" and making it "completely whole" is certainly in accord in a fraudulent price case, with giving the Government the difference between the price it paid due to the fraud, and the price it would have paid but for the fraud, or, in a fraudulent goods case, with giving the Government the difference between the value of the property it would have received but for the fraud, and the value of the property it has in fact received from the fraud doer.

Thus in the only case in which the United States Supreme Court has passed upon the measure of damages in a False Claims Act proceeding, it has affirmed (1) the refusal to apply the so-called out-of-pocket rule, which defendants contend that precedents compel this Court to follow, and (2) has held the so-called benefit-of-the-bargain rule applicable, which defendants contend that precedents prevent this Court from following.

Now let us turn to all the other Federal cases decided under the False Claims Act, which are claimed to bear on the damage question. Very recently, in United States v. American Packing Corp., D.C.N.J.1954, 125 F.Supp. 788, 791, this Court had presented to it practically a twin case in all ways to the case at bar, involving the same sort of meat contracts with the Government and the same continued fraudulent circumvention of the Government inspection processes, including bribery. In American Packing the Court laid down as the measure of damages "the difference between the value of what the Government was entitled to receive under the contracts and the value of what actually it received."

Again, in United States v. American Precision Products Corp., D.C.N.J.1953, 115 F.Supp. 823, 825, 828, another recent False Claims Act proceeding in this Court, somewhat earlier than American Packing, this branch of this Court applied the so-called benefit-of-the-bargain rule, not the out-of-pocket rule. Here the peculiar progress payment provisions of the war contract involved, must be carefully borne in mind. This contract provided that since the contractor was short of funds, the United States would advance to the contractor, on his certificate, "an amount equalling 80% of the value of inventory then on hand, plus 80% of the estimated value of work and supplies in their then state of completion". This 80% advance by the United States thus was not a payment of the contract price as such, but a payment on account of the "value of inventory" purchased by the contractor, to be used by him for the Government in completion of the war contract, whether then in a complete or incompleted state. Thus American Precision deals with the value of goods just as does the case at bar. The fraud inheres in the contractor's false statement as to the value of goods—goods purchased by the contractor for later delivery to the United States—just as the Grunsteins' fraud inheres in the value of the substandard meat actually delivered to the United States.

Under such facts this Court said as to the "Actual Damages. The damages suffered by plaintiff from the falsity or fraud of defendants are, irrespective of mitigation [a factor non-existent in Grunstein], the difference between what plaintiff advanced in reliance on such false claims, and what plaintiff would have advanced if the false items had not been included in the claims." (Parentheses this Court's.) As seen above, these "advances" were a percentage of the value of the goods purchased by the contractor for later delivery to the United States—the equivalent of the substandard meat already delivered by Grunstein to the United States. Thus American Precision laid down the rule that the damages were "the difference between" 80% of the value of the goods which the contractor falsely certified he had delivered in compliance with the contract, and 80% of the value of what he had in fact delivered. Applying this to the case at bar the damages would be the difference between the value of the

standard meat, which Grunstein falsely certified he had delivered in compliance with the contract, and the value of the substandard meat, which the Grunsteins had in fact delivered. This is obviously not the out-of-pocket rule, as claimed by defendants. On the contrary, it would seem to be the benefit-of-the-bargain rule.

In Faulk v. United States, 5 Cir., 1952, 198 F.2d 169, the issue was as to the damages suffered by the United States under the False Claims Act due to the contractor's delivery of reconstituted milk in lieu of fresh milk agreed to be furnished. The Court there upheld the application of a measure of damages based upon the percentage of the milk not consumed by the troops, rather than a measure based upon either the benefit-of-the-bargain or the out-of-pocket rules. This indicates the flexibility of the present measure of damages to be applied under False Claims Act proceedings. The only other cases under the False Claims Act, which defense claims bear on the measure of damages are United States v. Collyer Insulated Wire Co., D.C.R.I.1950, 94 F.Supp. 493, and United States v. Beaty Chevrolet Co., D.C.Tenn. 1953, 116 F.Supp. 810, 811. A careful reading of these cases, however, will show they do not pass at all on the measure of damages, but find either that damages are not provable, or do not lie at all.

Nor would this Court go so far as to say that no case could arise under the False Claims Act, where the so-called out-of-pocket rule could be applied. The true principle would seem to be that the fraud doer should repay the person defrauded "such damages as naturally and proximately resulted from the fraud." [132 U.S. 125, 10 S.Ct. 40.] Such indeed are the very words used by the United States Supreme Court in Smith v. Bolles, supra, note 2, in turn relied on by Sigafus v. Porter, supra, note 2,

neither of which, however, were False Claims Act proceedings, both being decided subsequent to the enactment of such statute in 1863, but long prior to Marcus. In Smith, where our highest court does not speak in terms of the "out-of-pocket" rule, it finds that because plaintiff could not credibly establish the "fruits of an unrealized speculation", in the form of the value of the speculative mining stock there involved, that plaintiff cannot therefore credibly establish the value of the property which he would have received but for the fraud. Not being able to establish this factor, essential under the benefit-of-the-bargain rule, the Court has recourse, as the provable damages "naturally and proximately result[ing] from the fraud", to the factors in the so-called out-of-pocket rule, which are provable in such a situation. Similar is the underlying rationale of Sigafus, where the facts involved a speculative gold mine, which case expressly relies upon Smith, and naturally reaches the same result.

■■ Indeed, if we look through the long line of cases, both Federal and State, dealing with damages in common-law fraud actions, so often alluded to as conflicting, we find such conflict to be more apparent than real. Every one of them, in essence, attempts to give the person defrauded such damages as he can prove "naturally and proximately resulted from the fraud", be it Marcus, or Smith, or Sigafus, or otherwise. In cases where the person defrauded can credibly and reasonably establish that which he would have received but for the fraud, it is that which the Court gives him, less what he has already received from the fraud doer.[3] In other cases where the evidence, as to what the person defrauded has lost due to the fraud, has been but speculative, so that he cannot credibly establish such value, then such person is remitted to what he can credibly establish he has lost, i. e.,

---

3. W. P. Walker & Co. v. Walbridge, 5 Cir., 1905, 136 F. 19; Southern Ice Co. v. Morris, 5 Cir., 1915, 219 F. 551; Okoomian v. Brandt, 1924, 101 Conn. 427, 126 A. 332.

the contract price, less again the value of what he has already received. In still other cases, where the person defrauded, as a reasonable man, could not expect to receive what the words of the contract called for—as where a gold mine of fabulous wealth has been purchased for a contract price of a relative pittance—there, since the person defrauded cannot reasonably have expected to receive that which the contract called for, he cannot justly claim that he has been defrauded of that which the contract called for. There again he is remitted to proof of the contract price, less again the value of what he has already received from the fraud doer.[4] Finally, there are relatively a few cases in which the courts have applied the so-called out-of-pocket rule solely in reliance on the above authorities, which have properly applied such rule to speculative situations or those of unreasonable expectation, and quite regardless of the fact that the situations in these latter cases were neither speculative nor involved unreasonable expectations.[5]

All but the last above group are at once seen to be quite in accord with the general principle that the person defrauded is always entitled to recover such damages as he can prove "naturally and proximately resulted from the fraud." All but such last group are fully in accord with Marcus, in its refusal under the facts there existing to apply the so-called out-of-pocket rule, and in its application of the so-called benefit-of-the-bargain rule. As for the last group of cases, suffice it to say that they are not only opposed to the fundamental principle above stated, and to the principles governing the decision of our highest court in Marcus, but they are opposed to the great weight of authority throughout the entire country. Selman v. Shirley, 161 Or. 582, 85 P.2d 384, 91 P.2d 312, 124 A.L.R. 1, 16, with its exhaustive note starting on page 37; 24 A.J., Fraud & Deceit, pages 54, 55, 60, Sec. 226, 227, 228; Sedgwick, Damages (9th Ed.) Sec. 1027; Sutherland, Damages (4th Ed.) Sec. 1172; Williston, Damages (Rev.Ed.) Sec. 1392.[6] Not only so, but practically all such Federal cases were decided before Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. Hence, if such cases were now decided, such courts would apply, not the rule they then did, but the rule of the appropriate State courts. The result would be, because of the above weight of authority, that such courts would now apply to such cases the ordinary benefit-of-the-bargain rule.

Indeed, reviewing the exhaustive collection of common-law fraud cases in 124 A.L.R. 1, supra, at page 52 et seq., we find that generally such cases of common-law fraud decided prior to the enactment of the False Claims Act in 1863 applied the benefit-of-the-bargain, not the out-of-pocket rule. Thus, since the Congressional debate anent the enact-

4. Roosevelt v. Missouri State Life Ins. Co., 8 Cir., 1935, 78 F.2d 752; Henderson v. Plymouth Oil Co., D.C.W.D. Pa.1926, 13 F.2d 932; Federal-American Nat. Bank & Trust Co. of Washington, D. C. v. McReynolds, 1933, 62 App.D.C. 291, 67 F.2d 251; Stratton's Independence v. Dines, 8 Cir., 1905, 135 F. 449, certiorari denied 197 U.S. 623, 25 S.Ct. 800, 49 L.Ed. 911; Hindman v. First National Bank, 6 Cir., 1902, 112 F. 931, 57 L.R.A. 108; Tooker v. Alston, 8 Cir., 1907, 159 F. 599, 16 L.R.A.,N.S., 818; Chandler v. Andrews, 2 Cir., 1911, 192 F. 543; Kell v. Trenchard, 4 Cir., 1905, 142 F. 16.

5. Pittsburgh Life & Trust Co. v. North-

ern Cent. Life Ins. Co., C.C.Pa.1905, 140 F. 888. Here, at nisi prius, the Court first found there was no fraud, so its damage rule statement would appear to be dicta.

See also Nupen v. Pearce, 8 Cir., 1916, 235 F. 497

6. That Restatement Torts, Deceit, Sec. 549, is not entirely to the contrary, note its Illustration 2, p. 114, thereunder, which apparently applies the benefit-of-the-bargain rule. Note also the fact that it recognizes, even when the out-of-pocket rule is applied, the right of the person defrauded to recover, in addition to the out-of-pocket measure, any "pecuniary loss suffered otherwise".

ment of the Act does not deal with the measure of damages applicable thereunder, the Congress, if it had this damage question in mind at all, must have had in mind the benefit-of-the-bargain rule. For the only Federal fraud case then decided was the nisi prius decision in Sherwood v. Sutton, C.C.N.H.1827, Fed.Cas.No.12,781, the damage rule there not being clearly the one or the other.

Doubtless the major reason why so many courts in the normal business transaction, as distinguished from the speculative transaction, have veered away from the out-of-pocket rule in favor of the benefit-of-the-bargain rule, is because: First, the out-of-pocket rule does not in fact do justice to the person defrauded. Second, it treats the wilful fraud doer more leniently than the law treats one who honestly breaches his contract. In fact, it places the defrauder in a position in which he cannot lose. As to the injustice to the person defrauded, when he can prove he expected to receive, by contract, goods of a certain kind, and he in fact has been furnished goods of another kind, can a court in justice overlook the fact that he has suffered a loss which "naturally and proximately results from the fraud," due to his not receiving what he did want, and his being delivered what he did not want? As to the defrauder, how can he lose under the out-of-pocket rule? If his fraud is not discovered, he pockets his dishonest profit. But even if his fraud is discovered, he need only pay his actual money profit, to the extent of the difference between the contract price he has received and the value of the unwanted goods he has delivered. He need repay the person defrauded not a penny, due to his delivery of the unwanted goods in place of the wanted goods. But if, instead of being a wilful fraud doer who violates his contract, he is an honest man who violates such contract, the honest man must repay this very difference between the value of the

wanted goods and the value of the unwanted goods delivered.

Largely because of the above many courts which previously, for good or bad reason, as above indicated, have applied the out-of-pocket rule in fraud cases, have, as in New Jersey, now determined that "as to some cases what is called the 'out-of-pocket' rule may furnish just and adequate compensation; in others the so-called 'benefit-of-the-bargain' rule may be the more just and accurate. The just method of determining damages necessarily varies with the facts of the particular case * * *." Zeliff v. Sabatino, 1954, 15 N.J. 70, 74, 104 A.2d 54, 56.

▪ So we turn to the final question—whether the facts of this case, in justice, require this court to apply the so-called benefit-of-the-bargain rule or the so-called out-of-pocket rule—and this, even admitting the fact that our highest court, in the only case before it, under the False Claims Act, which deals with the measure of damages, has refused to apply the out-of-pocket rule and has applied instead the benefit-of-the-bargain rule. Here the evidence so far is plenary, not to say overwhelming, that over a period of some two years defendants continually and calculatedly defrauded the Government in their meat contracts with it, by circumventing in all conceivable ways the Government's system of meat inspection, including even bribery. Clearly, such being the facts, justice calls strongly for the return to the Government, not of lost profits, but of that of which the Government has been credibly proven to have been defrauded. This proof is not speculatively, but clearly, set forth in the written specifications of the meat to be furnished, expressly referred to in writing in every Government purchase order. In turn, the values of such specified meat are established by the National Provisioner, in evidence. All these 400-odd transactions are analyzed and summarized, together with the other transactions of the de-

fendants during the same period in the proposed Government schedules above alluded to. Under such circumstances, the normal business rule is applicable, as applied in Marcus, that the "damages which the United States may have sustained" (as called for by the False Claims Act) are measured by the value of the property which the United States would have received by the contract but for the fraud, less the value of the property which the United States has in fact received from the fraud doer.[7]

In conclusion it would therefore appear (1) that in the only case in which the United States Supreme Court has considered the measure of damages in False Claims Act proceedings, it has applied not the so-called out-of-pocket rule, but the benefit-of-the-bargain rule; (2) that while the benefit-of-the-bargain rule is not necessarily the only rule that can be applied to such cases, it has been applied in most such cases which have considered the matter, as well as in most common-law fraud cases throughout the courts of the entire country, because of the inherent equity of such rule in the normal business transaction; that (3) all courts agree that the fraud doer should repay the party defrauded the damages which have "naturally and proximately resulted from the fraud." But (4) this general rule must be applied in accordance with the facts of the particular case. Thus (5) since the evidence in the case at bar clearly establishes the value of the meat, which defendant was under contract to deliver, that value, less the value of the meat in fact delivered, is the just measure of the actual damages which plaintiff has sustained, according to the present evidence. For this recovery should go under such facts, if, and when, liability is established.

7. Defendants contend they will prove that the Government could not have expected reasonably to receive the meat which the Government's purchase orders call for. Of course, if that conclusion is found by the jury to be correct, then the Government cannot expect to receive in this fraud action as damages, that which it did not reasonably expect to receive in fact. Under such circumstances, it would be entitled to receive the contract price, which it certainly would not have paid out but for the fraud, less the value of the goods it has received in fact from defendants.