UNITED STATES of America

v.

Charles C. HIBBS and Fairhill
Company, Inc.

Civ. A. No. 75–501.

United States District Court,
E. D. Pennsylvania.

Oct. 21, 1976.

Dennis C. Egan, Civil Div., Fraud Section, Dept. of Justice, Washington, D.C., for plaintiff.

Thomas B. Rutter, Philadelphia, Pa., for defendants.

## SUR PLEADINGS AND PROOF

LUONGO, District Judge.

This is a suit by the United States against defendants, Charles C. Hibbs and Fairhill Company, Inc., under the False Claims Act, 31 U.S.C. § 231, et seq.,[1] arising from false certifications which induced the Federal Housing Administration (hereafter FHA) to insure certain mortgages. The mortgagors defaulted on the mortgages and the United States was called upon to honor the claims of the mortgagee. It now seeks to recover statutory forfeitures plus double the amounts it was required to pay out on the defaulted mortgages, including acquisition and maintenance expenses in connection with the defaulted mortgage properties.

The matter was tried to the Court on March 22–24, 1976. Upon pleadings and proof, I make the following

## FINDINGS OF FACT

1. Defendant Charles C. Hibbs is an individual engaged in the business of selling real estate. He resides in Bala Cynwyd, Pennsylvania.

2. Defendant Fairhill Company, Inc. is a corporation organized pursuant to the laws of the Commonwealth of Pennsylvania. It is engaged in the selling of real estate with its principal place of business in Philadelphia, Pennsylvania.

3. No evidence was presented at trial as to defendant Fairhill Company, Inc.

4. On April 24, 1973, under Criminal No. 72–600 in the Eastern District of Pennsylvania, Charles C. Hibbs was convicted for making or causing to be made false statements to the Federal Housing Administration for the purpose of inducing agency action in violation of 18 U.S.C. § 1010.

5. The indictment consisted of 39 counts, three for each of 13 properties located in the 2900 block of North Marshall Street, Philadelphia, Pennsylvania, charging the submission of false statements in certifications as to the condition of the roof and the plumbing and heating and electrical systems in said properties.

6. Hibbs was the real estate broker on each of the properties, six of which (2909, 2911, 2915, 2917, 2923 and 2933 North Marshall Street) are involved in the present litigation.

7. Prior to the insuring of any mortgages on single family dwellings, the FHA assigns an appraiser to inspect the property

---

1. The False Claims Act was adopted in 1863. Act of Mar. 2, 1863, ch. 67, 12 Stat. 696. The statute was re-enacted into law as U.S.Rev. Stat. §§ 3490–3494, 5438. The civil provisions of the Act have been recodified with textual alterations at 31 U.S.C. § 231, et seq. Since Title 31 of the United States Code has not been enacted into positive law, the official text remains as in the Revised Statutes. See *United States v. Bornstein,* 423 U.S. 303, 305 n.1, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976); *United States v. Neifert-White Co.,* 390 U.S. 228, 228–29 n.1, 88 S.Ct. 959, 19 L.Ed.2d 1061 (1968); *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 539–40, 63 S.Ct. 379, 87 L.Ed. 443 (1943).

and render an opinion as to its value and condition, and to determine whether there is compliance with those standards and conditions prescribed by HUD regulations.

8. When an appraiser is confronted with conditions as to which he lacks expertise, he requests that the broker obtain certifications from a contractor that certain structural components comply with specifications or that certain work has been done according to specifications.

9. In those instances where certifications are requested, the FHA will not insure the mortgages unless such certifications are filed with the agency.

10. Hibbs caused certifications to be issued on the condition of the roof by Raymond Darrah on November 28, 1969, on the plumbing and heating systems by Joseph Matz on May 14, 1970, and on the electrical systems by Gerald Smith on April 30, 1970. The FHA relied upon the certifications in issuing its commitment to insure the mortgages on the above numbered properties.

11. The mortgagee on the six properties was the United Broker Mortgage Company, with its principal place of business in Philadelphia, Pennsylvania.

12. The convictions established that Hibbs, knowing that the certifications were false, caused them to be made or used for the purpose of inducing the FHA to issue mortgage insurance on the above properties.

13. The government would not have undertaken to insure the mortgages against default had it not been for the submission of the false certifications.

14. The mortgagors on the six properties became delinquent in their payments and defaulted on their mortgage obligations. Thereafter mortgagee presented claims to the FHA for payment on the mortgage insurance commitment.

15. The United States expended a total of $59,904.21 in honoring its insurance commitment on the six defaulted properties. The figures are broken down as follows:

| 2909 North Marshall | Acquisition costs * | $8,096.85 |
| | Maintenance costs | 656.93 |
| | Foreclosure costs ** | 1,445.47 |
| | | $10,199.25 |
| 2911 North Marshall | Acquisition costs | $8,490.41 |
| | Maintenance costs | 589.18 |
| | Negative escrow | 48.43 |
| | Foreclosure costs | 630.69 |
| | | $9,758.71 |
| 2915 North Marshall | Acquisition costs | $9,142.74 |
| | Maintenance costs | 572.21 |
| | Foreclosure costs | 212.43 |
| | Sub-total | 9,927.38 |
| | Positive escrow | 18.00 |
| | | $9,909.38 |
| 2917 North Marshall | Acquisition costs | $8,643.68 |
| | Maintenance costs | 785.19 |
| | | $9,428.87 |
| 2923 North Marshall | Acquisition costs | $9,744.31 |
| | Maintenance costs | 702.69 |
| | | $10,447.00 |
| 2933 North Marshall | Acquisition costs | $9,298.02 |
| | Maintenance costs | 862.98 |
| | | $10,161.00 |

* The acquisition costs generally consist of the following elements: unpaid principal balance of the mortgage, taxes advanced by mortgagee, preservation and maintenance expenses of the mortgagee, and insurance premiums.

** The foreclosure costs generally consist of the following elements: taxes, attorney's fees, and any incidental mortgagee disbursements made pursuant to foreclosure.

16. The government's expenditures of $59,904.21 to honor the mortgage insurance commitments would not have been made but for the submission of the false certifications.

17. The government has met its burden of establishing that the false certifications caused to be submitted by the defendant, Hibbs, resulted in the filing of a false claim by the mortgagee against the United States.

18. The government has sustained the following damages from the filing of the false claims, representing the amounts the government has expended pursuant to its insurance obligations which it would not have undertaken but for the false certifications caused to be submitted by the defendant Hibbs:

| | |
|---|---|
| 2909 North Marshall | $10,199.25 |
| 2911 North Marshall | 9,758.71 |
| 2915 North Marshall | 9,909.38 |
| 2917 North Marshall | 9,428.87 |
| 2923 North Marshall | 10,447.00 |
| 2933 North Marshall | 10,161.00 |
| | $59,904.21 |

The government is entitled to recover double said amount of damages for a total of $119,808.42.

19. False certifications were submitted with respect to six properties, 2909, 2911, 2915, 2917, 2923 and 2933 North Marshall Street. The government is entitled to the statutory forfeiture in the amount of $2,000 for each of the six properties, for a total of $12,000.

20. The property at 2911 North Marshall was occupied for approximately 18 months by Mr. and Mrs. Munoz. Mr. Munoz testified that during their occupancy the roof leaked; a drain backed up, causing the basement to fill with water; the heating in the upstairs rooms was inadequate; the electrical outlets functioned improperly; and that they moved out of the property because they had no money with which to make repairs.

21. I reject the Munoz' testimony as to the reason for moving out of the property, and find that the default on the mortgage was attributable to financial conditions unrelated to deficiencies in the property. This finding is based upon the following circumstances: (i) Munoz made no inquiries as to the cost to repair the defects, and made no effort to repair them; (ii) when Munoz moved into the property, he relied on anticipated rental income (approximately $160 a month) from his brothers to help carry the financing burden; the brothers moved out after only two months; (iii) Munoz made only seven mortgage payments in 18 months.

22. The property at 2917 North Marshall was occupied by the Morales family for approximately ten months. Mrs. Morales testified that the roof leaked in the upstairs middle bedroom; there were defects in the bathroom plumbing causing leaks; there was inadequate heat in the upstairs bathroom; and the electrical outlets did not function properly.

23. During the Morales' term of occupancy the mortgage payments increased from $86 to $91 per month, while Morales' wages declined from $120 to $90 a week as a result of a change of jobs.

24. The Morales became delinquent in their mortgage payments and defaulted.

25. The Morales' default was attributable to their changed financial circumstances, not to deficiencies in the property.

26. The property at 2923 North Marshall was occupied by the Adorno family for approximately 16 months. Mrs. Adorno testified that the electrical outlets were inadequate in the kitchen and living room; the plumbing drain in the yard backed up; and there was no heat in the upstairs bathroom or rear bedroom. The mortgagors made no effort to seek advice or estimates regarding repairs to these deficiencies.

27. The Adornos participated in a "mortgage strike," causing them to become eight months delinquent in their payments. They used the money "saved" from the mortgage payments to buy carpeting and install a room divider.

28. Mr. Adorno became unemployed and was involved in some type of litigation,

following which the Adornos subsisted on governmental aid and with financial assistance from their parents.

29. The Adorno default was attributable to financial incapacity and irresponsibility rather than to the deficiencies related to the false certifications.

30. No other former mortgagors of these properties testified in this litigation.

31. FHA Forms # 1025 covering each of the six defaulted properties, prepared by the mortgagee and submitted to the FHA as part of the claim settlement file, reflect that the specified reason for default was "improper regard for obligations." In none of these documents was reason No. 9—"Unsatisfactory property"—given as the reason for default. These forms furnish some evidence that the mortgagors made no complaints to the mortgagee concerning the condition of their properties as the reason for their defaults.

32. The government has presented competent and credible evidence, which I accept, that the electrical systems for which certifications had been issued were deficient in the following respects:

(a) in 2909, 2911 and 2915 North Marshall Street:

(i) the service cable was secured to the structure with roofing nails instead of screws;

(ii) the service panel was secured with plastic anchors;

(iii) a 100 amp. cable was cut down to fit the 60 amp. panel;

(iv) the houses were serviced by two circuit breakers—one for the heater, the other for lighting and the utility outlets;

(v) the water meter was not "bonded" ("grounded" by means of bond wire clamped to the water meter and the incoming water pipe);

(vi) failure to provide separate circuits for the utility outlets, the heater, and the lighting.

(b) in 2917, 2923 and 2933 North Marshall Street:

(i) three circuit breakers were provided, but the wiring was nevertheless deficient because of the failure to have separate circuits for the heater, lighting and utility outlets;

(ii) the absence of any electrical outlets in the upstairs rooms at 2933 constituted an additional deficiency.

33. The only feasible way to correct the electrical deficiencies in the properties would have been to replace the electrical service up to the panel and to rewire the interior. The total cost for correcting the electrical deficiencies would have totalled approximately $1,800 for the six properties.

34. The government has presented competent and credible evidence, which I accept, that the plumbing and heating systems for which certifications had been issued were deficient in the following respects:

(a) In all six properties, the absence of a temperature relief valve on the gas water heaters;

(b) In the heating systems of all six properties, inadequacy of hot air flow to the upstairs bathrooms and small bedrooms caused by improper balancing of the hot air flow attributable to the absence of dampers.

(c) A four inch soil pipe exposed on the rear wall of 2909 North Marshall Street was cracked over a length of five feet.

(d) With respect to the property located at 2911 North Marshall, there was a broken seal on the Test T, and an open two inch line which was never sealed. These defects enabled sewer gas to escape from these pipes into the premises.

(e) With respect to the property located at 2915 North Marshall, there was a capped, but unsealed Test T. In addition there was a loose rain spout at the rear of the building.

(f) An open line in the soil pipe at 2923 North Marshall Street, which permitted sewer gas to escape into the living area.

35. The total cost to remedy the plumbing and heating deficiencies for all six prop-

erties would have been approximately $1,685.

36. Evidence was presented that there were leaks in either bedrooms or bathrooms on the second floor of the properties located at 2911 and 2917 North Marshall Street. The government has failed to establish by a preponderance of the evidence either the specific locations of the leaks or that the leaks were attributable to deficiencies in the condition of the roofs.

37. The United States has presented no evidence as to the difference in value of the subject properties if the conditions had been as represented in the certifications as compared to their value with the conditions as they actually existed.

38. The United States has been able to sell only one of the properties, 2915 North Marshall Street. That property was sold for $100 on March 24, 1975.

39. Sometime after the mortgagors vacated the properties, as a result of litigation before another judge of this court relating to lead base paint in the North Marshall Street properties, the FHA was required to give certain assurances concerning the absence of lead base paint before the houses could be sold. The lead base paint condition was something not known to the parties to this litigation in 1969.

## DISCUSSION

■ Hibbs' conviction on the criminal charges estops him from disputing in this suit that he caused to be submitted to the FHA false certifications as to the condition of the roofs, and the plumbing and heating and electrical systems of 13 properties, six of which are in issue in this case, for the purpose of influencing action by the FHA. *See Emich Motors Corp. v. General Motors Corp.,* 340 U.S. 558, 71 S.Ct. 408, 95 L.Ed. 534 (1951).

The version of the False Claims Act which is currently in force is U.S.Rev.Stat. § 3490, which provides, in part:

"Any person . . . who shall do or commit any of the acts prohibited by any of the provisions of section fifty-four

hundred and thirty-eight, Title 'CRIMES,' shall forfeit and pay to the United States the sum of two thousand dollars, and, in addition, double the amount of damages which the United States may have sustained by reason of the doing or committing such act . . . ."

U.S.Rev.Stat. § 5438 (*repealed,* Act of Mar. 4, 1909, ch. 321, § 341, 35 Stat. 1153, but still in force insofar as incorporated into § 3490, *see United States v. Bornstein,* 423 U.S. 303, 305–07 n.1, 96 S.Ct. 523, 526, 46 L.Ed.2d 514 (1976)) subjected to criminal liability

"Every person who makes or causes to be made, or presents or causes to be presented, for payment or approval, to or by any person or officer . . . of the United States, any claim upon or against the Government of the United States, or any department or officer thereof, knowing such claim to be false, fictitious, or fraudulent, or who, for the purpose of obtaining or aiding to obtain the payment or approval of such claim, makes, uses, or causes to be made or used, any false bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statement or entry . . . ."

■ The United States is entitled to recover the forfeitures even in the absence of proof of actual damages because of the expense incurred in the efforts to protect its funds and property. *Toepleman v. United States,* 263 F.2d 697 (4th Cir.), *cert. denied,* 359 U.S. 989, 79 S.Ct. 1119, 3 L.Ed.2d 978 (1959). There is no disagreement between the parties as to the number of forfeitures to which the United States is entitled in this case—one $2,000 forfeiture for each of the six defaulted properties. A default on a mortgage and a subsequent demand for payment can support only one forfeiture even though several false representations were made in the various certifications submitted to the government to induce it to issue its mortgage insurance commitment. *See United States v. Cooperative Grain and Supply Co.,* 476 F.2d 47 (8th Cir. 1973). *See also United States v. Bornstein,*

423 U.S. 303, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976).

The main dispute in this case is as to "the amount of damages which the United States may have sustained by reason of the doing or committing such act." The government's position is that it would not have insured the mortgages without the false certifications; consequently the damages it has sustained are the amounts it has been required to pay out to make good on the mortgage insurance which it issued. The government contends that the False Claims Act imposes a form of strict liability in which the government is required to establish only two things: (1) false statements which induced it to assume an obligation; and (2) payments pursuant to the obligation assumed. It is defendant's position that the government must establish a causal connection between the false statements for which defendant was convicted (the false certifications) and the damage sustained by the government. On that premise, defendant argues that there is no causal connection between the false certifications and the defaults on the mortgages which, in turn, required the United States to make good on its mortgage insurance.

■ The starting point in resolving this dispute is to identify the "false claim" within the meaning of the Act. The false claim is the claim for reimbursement submitted by the mortgagee under the FHA insurance commitment. *See United States v. McNinch*, 356 U.S. 595, 78 S.Ct. 950, 2 L.Ed.2d 1001 (1958); *United States v. Tieger*, 234 F.2d 589 (3d Cir.), *cert. denied*, 352 U.S. 941, 77 S.Ct. 262, 1 L.Ed.2d 237 (1956). Even though the mortgagee was an innocent party, its claim for reimbursement was a false claim, because grounded in fraud, the fraud being the false certifications which Hibbs caused to be issued, and upon which the FHA relied in issuing its insurance commitment. *United States v. Veneziale*, 268 F.2d 504 (3d Cir. 1959).[2] This analysis becomes important because it identifies as "the act" from which the United States sustained damages the mortgagee's request for reimbursement, rather than the false certification.

■ Immediately following the presentation of evidence, I found, and I reiterate, that there was no causal connection between the false certifications and the mortgage defaults. For each property as to which the government presented evidence, I found that the defaults were caused by circumstances unrelated to the condition of the roofs, or the plumbing and heating and electrical systems. The defaults were caused either by the mortgagors' changed financial circumstances or by their financial irresponsibility. For purposes of the False Claims Act, however, this was not the pertinent inquiry. I also found that the FHA had relied on the false certifications in issuing its commitment to insure the mortgages. Thus, there was a clear causal connection between the false certifications and the government's assumption of the obligations. There was likewise a clear causal connection between the government's assumption of the obligations and the payments it was required to make upon the occasion of the

2. In *Veneziale,* a vendor caused purchasers to make application for bank loans wherein it was falsely represented that the loan was for home improvements, when in fact it was used to purchase real property from the vendor. The fraudulent application became one of the essential documents which induced the FHA to guarantee the loan. The purchaser defaulted on the loan and the government was compelled to repay the outstanding balance. Although *Veneziale* did not specifically deal with the issue of the need for causal connection between the false application and the subsequent losses, the court's language, at p. 505, is instructive:

"Here it is clear that the fraudulent statement in the loan application as to the purpose of the borrowing was an essential inducement to the Federal Housing Administration guaranty upon which the government has now had to pay. Thus the wrong of the defendant was an important, even an essential factor in subjecting the government to an enforceable demand for money. Although the wrongdoer neither sought nor obtained any transfer of government funds or property to himself, it has long since been settled that a fraudulently induced contract may create liability under the False Claims Act when that contract later results in payment thereunder by the government, whether to the wrongdoer or someone else."

defaults on the mortgages. *United States v. Veneziale, supra.* For whatever reason the mortgage defaults occurred, whether because of deficiencies in the properties or because of financial irresponsibility of the mortgagors, or for any other reason, the fact remains that the United States had to make good on mortgage insurance obligations it would not have assumed but for the false certifications.

Unfortunately for defendant Hibbs, the cases seem to adopt the "but for" approach. But for the false certifications the United States would not have issued the mortgage insurance; but for the issuance of the insurance the United States would not have been subjected to the submission of the claims by the mortgagee upon default by the mortgagors. The claims thus submitted by the mortgagee were grounded in defendant's fraud. *See United States v. Ekelman & Associates, Inc.,* 532 F.2d 545 (6th Cir. 1976); *United States v. Veneziale,* 268 F.2d 504 (3d Cir. 1959); *United States v. Klein,* 230 F.Supp. 426 (W.D.Pa.1964), *aff'd,* 356 F.2d 983 (3d Cir. 1966); *United States v. Globe Remodeling Co.,* 196 F.Supp. 652 (D.Vt.1961). It is clear, then, that the United States was damaged at least to the extent of the unpaid balance of the mortgages.

Hibbs makes one further argument. He urges that, even if it be determined that the United States is entitled to recover for the unpaid balance of the mortgages, it is not entitled to "consequential damages", i.e. the expenses of foreclosure and maintenance of the properties, citing *United States v. Aerodex, Inc.,* 469 F.2d 1003 (5th Cir. 1972).

The expenses incurred by the government incident to the foreclosure and the maintenance of the six properties are compensable under the False Claims Act if such expenses were incurred as a proximate result of the false claim which had its origin in Hibbs' fraud. *Toepleman v. United States,* 263 F.2d 697 (4th Cir.), *cert. denied,* 359 U.S. 989, 79 S.Ct. 1119, 3 L.Ed.2d 978 (1959). The *Aerodex* case, on which Hibbs relies, was one in which the United States had

purchased certain parts which turned out to be defective. The Court of Appeals there reversed the award of consequential damages for the cost to "retrofit" a number of aircraft engines into which the defective goods had been installed. The Court there noted that such damages were not the proximate result of the submission of false vouchers by the suppliers, but rather were the result of the installation of the defective goods in the aircraft engines. In the instant case, the government is not in the role of a consumer as it was in the *Aerodex* case, it is an insurer. The importance of that difference was noted in *United States v. Ekelman & Associates, Inc.,* 532 F.2d 545, 551 (6th Cir. 1976):

> "In the present case, we are not concerned with the delivery of defective goods to the government under a supply contract. Instead, as the result of fraud, the government was forced to take possession of the real property and assume the burden of preserving it."

In *Ekelman* the defendants had fraudulently induced the Veterans Administration to guarantee, and the Federal Housing Administration to insure, a number of loans. When a loan went into default the VA and FHA had to expend funds to discharge the obligations and maintain the property. The Court, in upholding the district court's grant of maintenance and repair expenses, noted, at p. 551:

> "As a result of the fraud in the present case, the property securing the guaranteed and insured loans and the necessary burden of preserving the property were thrust on the government. We conclude that the government is entitled to the *reasonable* expenses incurred in preserving the property." (Emphasis in original)

In the instant case, likewise, it is clear that the government incurred the additional expense of foreclosure and maintenance in the discharge of the duty thrust upon it as a direct result of the filing of the false claims by the mortgagee. Accordingly, all such expenses are damages recoverable under the False Claims Act.

The result is harsh indeed. For want of a few hundred dollars' worth of work on each property, Hibbs has become, in effect, the guarantor of mortgages amounting to close to $10,000 each, and is required to pay *double* the amounts the government has had to expend to make good on defaults which I have found to be totally unrelated to the conditions for which the certifications had issued. To make the result all the more severe, at the time of the defaults these houses had virtually no resale value due largely to a lead base paint condition of which neither Hibbs nor FHA was aware at the time the certifications issued. I reach this result because legal precedent requires it. It will be for the appellate courts to determine whether, as Hibbs urges, the measure of damages should bear a more equitable relationship to the deficiencies in the condition of the properties, and to determine whether defendant's liability should be restricted, for example, to double the difference in the value of the properties as they actually were and their value if they had been as represented, or to double the reasonable cost of the repairs necessary to put them in the condition as represented.

A further question remains, whether the government is entitled to prejudgment interest on the damages. The most recent case on point is *Peterson v. Weinberger,* 508 F.2d 45 (5th Cir.), *cert. denied,* 423 U.S. 830, 96 S.Ct. 50, 46 L.Ed.2d 47 (1975), where the Court concluded, at p. 55:

> "We subscribe to the view that since double damages, plus a specified sum, was provided in the False Claims Act for the purpose of making sure that the Government would be made completely whole, it is error to assess prejudgment interest on the recoverable amount."

The same view has been expressed by at least two other courts. *United States v. Foster Wheeler Corporation,* 447 F.2d 100 (2d Cir. 1971); *United States v. Globe Remodeling Co.,* 196 F.Supp. 652 (D.Vt.1961). On the strength of these cases I conclude that prejudgment interest should not be awarded in this case.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and the subject matter.

2. The Federal Housing Administration, an agency within the Department of Housing and Urban Development, is a department of the government of the United States.

3. The defendant, Charles C. Hibbs, is estopped to relitigate the issue as to whether he caused false certifications to be submitted to the FHA for the purpose of inducing the FHA to act.

4. The defendant, Charles C. Hibbs, knowingly caused false certifications to be submitted for the purpose of inducing the FHA to insure the mortgages on the properties here in litigation.

5. The United States has established that, but for the false certifications caused to be submitted by the defendant Hibbs, the government would not have insured the loans made by the mortgagee.

6. The claims submitted to the government by the mortgagee following default on the insured mortgages were false in that they were grounded on the fraud of defendant Hibbs.

7. The United States is entitled to recover those damages which naturally and proximately resulted from the false claims, namely: (a) acquisition costs, (b) maintenance costs, and (c) foreclosure costs.

8. Maintenance and foreclosure costs are recoverable since they were incurred in preserving the properties, a burden the government would not have had but for the fraud of the defendant Hibbs.

9. Prejudgment interest may not be properly recovered as an aspect of "actual damages" under the False Claims Act.

10. The United States is entitled to recover one forfeiture in the amount of $2,000 on each of the six properties in litigation.

11. The United States is entitled to recover double the amount of actual damages it has sustained by reason of the acts committed in violation of the False Claims Act.

12. The United States is entitled to judgment against the defendant, Charles C. Hibbs, in the amount of $131,808.42, consisting of

(a) Two times the actual damages ($59,904.21) = $119,808.42
(b) $2,000 (statutory forfeiture) × 6 = $\underline{12,000.00}$
$131,808.42

13. The defendant, Fairhill Company, Inc., is entitled to judgment in its favor.