**UNITED STATES of America, Plaintiff,**

v.

**BOARD OF EDUCATION OF the CITY OF UNION CITY, et al., Defendants.**

**Civ. A. No. 83–2651.**

United States District Court, New Jersey.

Aug. 17, 1988.

As Amended Sept. 26, 1988.

Samuel A. Alito, Jr., U.S. Atty. by Vincent E. Gentile, U.S. Dept. of Justice, Newark, N.J., for plaintiff.

Frederick J. Gross, Mt. Ephraim, N.J., for defendant Dentico.

Joseph W. Farrell, Union City, N.J., for defendant Aimone.

Frank J. Scarafile, Project Return Community Treatment Center, New York City, pro se.

Dominick D'Agostino, Lewisburg, Pa., pro se.

John J. Powers, Danbury, Conn., pro se.

William Musto, Union City, N.J., pro se.

Anthony V. Genovese, Ridgewood, N.J., pro se.

Lewis & McKenna by Paul Z. Lewis, Saddle River, N.J., for defendant Genovese.

## OPINION

WOLIN, District Judge.

### I. INTRODUCTION

In the instant motion, plaintiff, the United States, seeks summary judgment on the issue of damages in the underlying civil suit brought by the government for violations of the False Claims Act, 31 U.S.C. §§ 3729–3731, common law fraud, breach of contract, unjust enrichment and conversion. The present action follows the criminal convictions of many of the defendants for their roles in a plan to pocket federal funds earmarked for the purpose of improving Union City schools. On October 15, 1985, Judge Sarokin granted partial summary judgment in favor of the United States on the issue of liability against defendants William V. Musto, John J. Powers, Frank Scarafile, Gildo Aimone, Anthony Genovese, Dominick D'Agostino and Lawrence Dentico on Counts I, II, and III of the Complaint. *United States v. Board of Education of Union City, et al.*, Civ. No. 83-2651, slip op. at 3 (D.N.J., filed October 15, 1985).[1] Contemporaneously, summary judgment on the issue of damages was denied without prejudice to the right of the government to file supplemental briefs detailing its claim. *Id.* The current motion by the United States follows its submission of a supplemental brief detailing its damage claim. It seeks to establish damages against defendants Musto, Powers, Scarafile, Aimone, Genovese, D'Agostino and Dentico for their violations of the False Claims Act.

### II. BACKGROUND

#### A. *The Defendants*

The defendants to this suit are: William V. Musto, former Union City Mayor and State Senator; John Powers, former Union City Board of Education President; Frank Scarafile, former school board member and Union City Deputy Police Chief; Gildo Aimone, who acted as the authorized representative of the board in acquiring and

---

1. Counts I and II consisted of allegations of violations of the False Claims Act, 31 U.S.C. §§ 3729–3731. As per Count I, defendants were found to have "combined, conspired and agreed to defraud the United States by obtaining or aiding of payment or approval of false or fraudulent claims." (Verified Complaint ¶¶ 28–57, slip op. at 15). Under Count II, defendants were found to have "knowingly caused to be presented to the Economic Development Administration ("EDA") for payment or approval, false or fraudulent claims, or knowing to be made, used, or caused to be used, false records or statements to get such false or fraudulent claims paid or approved." (Verified Complaint ¶¶ 58–60, slip op. at 15). Count III is an action for common law fraud. (Verified Complaint, ¶¶ 61–63). On November 19, 1985, the opinion was amended so that Musto, Scarafile, D'Agostino and Dentico were relieved of liability for Count II.

distributing the federal funds; Anthony Genovese and Herbert Maddalene, partners in an architectural firm hired by the Board to supervise the construction projects; the architectural firm of Genovese and Maddalene; Dominick D'Agostino and Lawrence Dentico, both of whom had an interest in and exercised control over construction firms involved in the high school projects; and the Union City Board of Education.

Some of the defendants are currently serving prison terms for racketeering, mail and wire fraud, and other related offenses. These were committed in connection with the conspiracy that existed to defraud the government. The opponents to this motion, Musto, Powers, Aimone, D'Agostino, Genovese,[2] and Scarafile are all acting *pro se;* Dentico is represented by counsel.

### B. *The Fraudulent Scheme*

In 1977, Union City and the Union City Board of Education applied to the EDA for funds to improve Union Hill and Emerson High Schools. Defendant Musto, as Mayor, signed the applications, certifying that the funds would be used according to regulations, and that the EDA would be provided with reports on the project's progress and the disbursement of funds. Grants ultimately totalling $4,462,000 were provided. Defendant Powers signed to accept the grants, reaffirming that the funds would only be used for genuine costs incurred in the high school projects.

Thereafter, it is alleged that defendants Musto, Powers, Scarafile and Genovese agreed to "bend the law" to assist the Orlando Construction Co., controlled by defendants Dentico and D'Agostino; that the defendants, through Aimone, advanced funds to Orlando on a fraudulent basis; and that Genovese certified false reports and change orders submitted to obtain funding.

The government maintains that $940,280 in grant money fell victim to this scheme and did not go into improving Union Hill and Emerson High Schools. The government claims that this figure represents the damages sustained as a result of the submission of false or fraudulent claims. As already noted, defendants Musto, Powers, Scarafile, Genovese, Aimone, D'Agostino and Dentico were found liable for such damages under Counts I, II and III. In the instant motion, the United States seeks to establish the amount of damages owed to it under the False Claims Act, for which defendants are jointly and severally responsible. Additionally, the United States seeks to impose a penalty against every defendant for each of the 21 alleged violations of the False Claims Act. For the following reasons this motion is granted in part and denied in part.

### III. DISCUSSION

### A. *Standard for Summary Judgment*

Summary judgment may be granted only when it has been established that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party has the burden of establishing that there exists no genuine issue of material fact. *Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The opposing party must set forth specific facts showing that a genuine issue exists. *Id.* In deciding a motion for summary judgment, the facts must be viewed in the light most favorable to the non-moving party and any reasonable doubt as to the existence of a genuine issue of fact must be resolved against the moving party. *Continental Ins. Co. v. Bodie,* 682 F.2d 436 (3d Cir.1982).

### B. *Application of Amended Statute*

It is appropriate for this Court to apply the current version of 31 U.S.C. § 3729 to the motion before it. The crucial differences between the False Claims Act as it existed when this case was filed and the False Claims Act as amended in 1986 are that treble damages rather than double

---

2. Genovese, who was represented by counsel when this motion was originally filed, is now proceeding pro se.

damages are now awarded, and that the penalty figure has risen from $2,000 per violation to between $5,000 and $10,000.

■ Generally, a new statute applies to cases pending on the date of its enactment unless manifest injustice would result, or there is a statutory directive or legislative history to the contrary. *United States v. Fernandez–Toledo,* 749 F.2d 703, 705 (11th Cir.1985); *United States v. Ford,* 737 F.2d 1506, 1508 (9th Cir.1984); *Central Freight Lines, Inc. v. United States,* 669 F.2d 1063, 1069 (5th Cir.1982) (citing *Corpus v. Estelle,* 605 F.2d 175, 180 (5th Cir.1979), *cert. denied,* 445 U.S. 919, 100 S.Ct. 1284, 63 L.Ed.2d 605 (1980)) (citing *Bradley v. Richmond School Board,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974)). In the instant case, no statutory directive exists indicating that the amended form of 31 U.S.C. § 3729 should not be retroactively applied to pending cases. Legislative history indicates, if anything, that legislators were anxious for the amendments passed in 1986 to go into effect immediately. S.Rep. No. 345, 99th Cong., 2d Sess., *reprinted in* 1986 U.S.Code Cong. & Admin.News 5266. The issue of manifest injustice, however, requires a more detailed analysis.

*Bradley* sets forth a three part test to determine whether manifest injustice would result from the application of a new law: the nature and identity of the parties, the nature of the parties' rights, and the impact of the change in law on those rights. *Bradley v. Richmond School Board,* 416 U.S. at 716–21, 94 S.Ct. at 2019–21 (1974). In *Central Freight Lines,* this test was applied when a decision of the Interstate Commerce Commission ("ICC") was contested by short haul motor carriers operating in Texas. The decision granted eight new long haul carriers permission to operate in the state. In 1978, the eight long haul carriers applied for this right under the Motor Carrier Act of 1935; they were granted permission under the 1980 version of the Act which had been passed during the pendency of their applications. Despite objections from the short haul carriers, who contended that the 1935 Act should have been used in reviewing the

applications, the Court of Appeals affirmed the ICC's use of the new law. 669 F.2d at 1069. Specifically, the Fifth Circuit found that no injustice occurred regarding the second and third parts of the test because the new law did not unfairly deprive the appellants (*i.e.,* the short haul carriers) of any legal rights. The court stated that these carriers did not have the unconditional right to render their services without competition from others, nor did they have any vested right to have such competition determined under the old law. *Id.*

■ In the case at hand, there exists even less of a chance of injustice; these defendants had no identifiable legal right as to the magnitude of sanctions applicable to violations of the law. Neither the nature of the defendants' rights nor the impact of the change in § 3729 constitutes manifest injustice. Thus, the second and third prongs of the *Bradley* test are satisfied.

As for the nature of the parties, the first prong under *Bradley, Central Freight Lines* states that this factor should be weighed against the second and third. The fact that most of the defendants are acting *pro se,* and that they may not be as capable in the presentation of this case as is plaintiff, is outweighed by the fact that defendants knew they would be responsible for a great deal of money as a result of their unlawful actions in the event that their scheme was found out. Whether this figure is tripled or "merely" doubled, it is still a very large sum. There is no reason to believe that if defendants had known the damages and penalties would be greater (by a factor of one) than those existing at the time of the fraud, then they would have been deterred from their acts. Defendants received adequate notice that their liability would be considerable.

In addition to the lack of manifest injustice, it is well established that statutes relating to remedies are retroactively applicable to pending litigation. *Friel v. Cessna Aircraft Co.,* 751 F.2d 1037, 1039 (9th Cir. 1985); *United States v. Blue Sea Line,* 553 F.2d 445, 448 (5th Cir.1977); *Amoco Production Co. v. Douglas Energy Co., Inc.,*

613 F.Supp. 730, 737 (D.Kan.1985); *Jorae v. Clinton Crop Service*, 465 F.Supp. 952, 955 (D.Mich.1979); *Grenier v. United States Internal Revenue Service*, 449 F.Supp. 834, 842 (D.Md.1978). A statute is remedial if it does not create any new rights, or eliminate any vested ones, but rather it only acts in furtherance of an already existing remedy. *Jorae*, 465 F.Supp. at 955.

## C. *False Claims Act, 31 U.S.C. § 3729 (1986)*

■ The False Claims Act provides for a civil penalty that equals the combined total of: a $5,000 to $10,000 penalty for *each* violation of the False Claims Act (hereafter, "statutory penalty"), and three times the damages that the government sustains as a result of the violations (hereafter, "statutory damages").[3] Where defendants are found responsible for a particular false claim, they are jointly and severally liable for the penalty in addition to any damages assessed. *United States v. American Packing Corp.*, 125 F.Supp. 788, 797 (D.N. J.1954).

### 1. *Statutory Damages.*

■ The False Claims Act allows the United States to recover only damages for harm actually sustained due to defendants'

fraudulent acts. *United States v. Cooperative Grain and Supply Co.*, 476 F.2d 47, 63 (8th Cir.1973); *United States v. Collyer Insulated Wire Co.*, 94 F.Supp. 493, 498 (D.R.I.1950). There are two formulas that have been used to calculate actual damages where a benefit has been received from the perpetrator of the fraud, *United States v. Ben Grunstein & Sons Co.*, 137 F.Supp. 197, 205 (D.N.J.1956), either the "substandard product" formula or the "fraudulently inflated price" formula. *Id.* The United States indicated in its brief that the damages it sustained resulted from its receipt of a substandard product. However, inasmuch as it did not allege specifically that the product which it received was substandard, this fact may be gleaned only from the formula the government proposes for the calculation of said damages.[4] Additionally, the government proposes that the court apply the substandard product formula to only the ill-gotten funds, rather than to the relative values of the project as a whole, with and without fraud, despite the general rule that the impact of fraud is usually measured with respect to the cost of the entire project.[5]

The government has not shown that it received zero benefit from the entire sum of illegally procured funds. However, in light of the fact that the government itemized the instances wherein the claimed

**3.** The relevant section of the False Claims Act, 31 U.S.C. § 3729 provides:

(a) Liability for certain acts.—Any person who—

(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of an Armed Forces of the United States a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

(3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;

\* \* \* \* \* \*

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus three times the amount of damages which the Government sustains because of the act of that person....

**4.** The formula for substandard product is as follows: damages equals the value of that which

plaintiff would have received had there been no fraud minus the value of that which plaintiff actually received. *United States v. Bornstein*, 423 U.S. 303, 316 n. 13, 96 S.Ct. 523, 531, n. 13, 46 L.Ed.2d 514 (1976); *United States v. Ben Grunstein & Sons Co.*, 137 F.Supp. 197, 205 (D.N.J.1956); *United States v. American Packing Corp.*, 125 F.Supp. 788, 791 (D.N.J.1954).

**5.** The United States alleges that the result of this formula encompasses *all* funds procured through false or fraudulent claims. This assumes that the amount to be subtracted from the value of that which plaintiff would have received had there been no fraud is zero. Although the government contends it received nothing from any of the illegally procured funds it has failed to establish that *none* of the ill-gotten funds actually went into the school projects. Accordingly, the government's recovery must be offset by the value of the benefit it received. *United States v. Ben Grunstein & Sons Co.*, 137 F.Supp. 197, 205 (D.N.J.1956); *United States v. American Packing Corp.*, 125 F.Supp. 788, 791 (D.N.J.1954).

damages occurred, it becomes apparent that, as a matter of law, in certain instances zero benefit accrued to the government. They are the following: Change Order No. 11—Union Hill High School, Change Orders 4–8, Change Orders 11–14—Union Hill High School, and Change Order 24—Union Hill High School. Additionally, a portion of the June 1978 advance for $100,000 can be definitively identified as a loss.

**(a) Change Order No. 11—Union Hill High School.** The government's brief and appended exhibits reveal this change order was "totally false" and that the "work was not done." Change Order No. 11 was in the amount of $35,337. This money was falsely claimed and the government received no benefit from it. The entire figure represents a loss.

**(b) Change Orders 4–8.** The government was billed twice for the performance of the work covered by Change Orders 4–8. Their costs totalled $38,261. This claim was false and the government could not have received the work requisitioned as it had already been performed. Therefore, the United States suffered $38,261 in damages.

**(c) Change Orders 11–14—Union Hill.** These were also submitted for payment twice, and resulted in a loss to the government. The work called for by Change Orders 11–14 could not have been rendered twice. Change Order 11, which has been established as having never been performed at all, certainly could not have been done a second time. Change Orders 11–14 cost the United States $113,345, which constitutes the damages suffered on this aspect of the government's claim.

**(d) Change Order 24—Union Hill.** Change Order 24 was a duplicate of number 11. This represented the third time for which this same false claim was paid. The United States sustained a resultant loss of $35,337.

**(e) June 1978 Advance for $100,000.** The June advance was comprised of two checks. One was made out to Mazziota–D'Agostino for $70,000. The other went to Joseph Pissaro Trucking, and was for $30,-000. Only a portion of each of these checks may clearly be established as damages, although the claim was undoubtedly false.

The check for $70,000 was delivered to Mazziota–D'Agostino and returned to Orlando the next day. Dominick D'Agostino was paid $18,500 for allowing this money to come down to him and for returning it. This "cut" was a cost for which the United States received no benefit. The $30,000 check met a similar fate. The "cut" taken out of this check was 7% or $2,100. This, too, was also a total loss to the United States.

Other than the $20,600 already accounted for, the balance of the $100,000 advance may not be established as damages as a matter of law. Plaintiff makes no allegations as to where the money went once it was returned to Orlando. There is no evidence offered to indicate the balance did not go into the construction project. The benefit, or lack thereof, that the United States experienced from the remaining $79,400 cannot be determined as a matter of law in the instant motion for summary judgment. Therefore, damages beyond the $20,600 in pay-offs may not be deducted from the $100,000 June 1978 advance and therefore may not be included within that portion of the summary judgment "pool" of damages.

There are other instances wherein the United States' damage claims are not sufficiently documented to be established by summary judgment. These include: (1) March 24, 1978 payment of $153,000; (2) July 31, 1979 advance for $100,000; (3) August 9, 1979 advance for $100,000; (4) August 29, 1979 payment of $25,000; (5) September 25, 1979 advance for $120,000; and (6) November 2, 1979 advance for $120,000.

■ All of the above are inadequate because of plaintiff's failure to prove, or even allege, what was done with this money. Throughout the entire time these false claims were being presented, work on the projects was being done. Perhaps very little work was in fact accomplished, but if absolutely zero benefit was received by the

government, it must be proved. In order to utilize the formula that determines damages when a substandard product is claimed, the value of that which has been received must be discovered, thus rendering them eligible for inclusion in the summary judgment pool of damage funds.[6]

Accordingly, with respect to actual damages, $242,880 has been established as a matter of law. Pursuant to 31 U.S.C. § 3729, this figure shall be tripled. Therefore defendants are jointly and severally liable for $728,640.

### 2. *Statutory Penalties.*[7]

The False Claims Act provides for a penalty of between $5,000 and $10,000 for each separate violation. The United States claims that 21 violations occurred, and therefore asserts that it is entitled to that same number of penalties. Defendant Genovese claims that only seven acts occurred which may be penalized under the False Claims Act. Other defendants deny that the United States is entitled to any penalties at all.

In determining the appropriate number of penalties, if any, that may be imposed against the defendants, two issues must be addressed: First, what constitutes a violation of 31 U.S.C. § 3729; and, second, each separate violation which occurred must be accounted for. In the name of expediency, these questions are most easily addressed by separately analyzing the three clauses of the False Claims Act with which we are concerned.

**(a) 31 U.S.C. § 3729(a)(1):** Knowing presentation of a false claim.[8] In a recent case, the Third Circuit listed those elements that constitute a violation of the first clause of the False Claims Act. They are as follows:

1. The defendant presented or caused to be presented, for payment or approval, to the Government of the United States a claim upon or against the United States;

2. The claim was false, fictitious, or fraudulent;

3. The defendant knew that the claim was false, fictitious, or fraudulent; and

4. To recover damages, it must be shown that the United States sustained damages by reason of the false claim.

*United States v. Lawson,* 522 F.Supp. 746, 750 (D.N.J.1981) (citations omitted). For the purpose of the current analysis, this Court need not address the fourth element, it has already been discussed, *supra,* in the issue of "damages." Moreover, the third requirement, knowledge, will be discussed *infra.* The first element presents the fundamental question, inasmuch as it addresses what exactly is meant by the word "claim".

■ Obviously, a claim must necessarily be made upon which to predicate a violation of the False Claims Act. *United States v. Azzarelli Construction Co.,* 647 F.2d 757, 759 (7th Cir.1981). However, not every false statement made to the government qualifies as a claim. *United States v. Greenberg,* 237 F.Supp. 439, 442 (S.D.N.Y. 1965). The presentation of a claim for payment or approval "normally connotes a demand for money or for some transfer of public property." *United States v. Lawson,* 522 F.Supp. at 750 (citing *United*

---

6. In addition, there is no evidence offered to prove that Mr. Orlandini's affidavit in connection with the August 8th advance, which is claimed to be false, is actually false. Nothing appears in the testimony in the appendix to plaintiff's brief to that effect. Similarly, documents referred to in the government's claim for the August 29th payment of $25,000, *i.e.,* government Trial Exhibit 240A and Musto Tr. 9.210–12 to 15 are missing.

7. It should be noted that when this motion was originally filed, the statutory penalty provided by the False Claims Act was $2,000 per violation. Thereafter, the Act was amended and, as noted, it now provides for a statutory penalty of between $5,000 and $10,000 per violation. However, overall fairness would seem to dictate that this Court should invoke the lower bound (*i.e.,* $5,000) inasmuch as it is already two-and-one-half times as great as the statutory penalty in existence at the time of the conspiracy and the filing of this civil action. Nonetheless, the Court will reserve as to the amount assessed per statutory penalty for 30 days from the date of the filing of this opinion, during which time the parties will be entitled to submit their respective positions on this issue.

8. *See supra* note 3 for text of § 3729(a)(1).

*States v. McNinch,* 356 U.S. 595, 599, 78 S.Ct. 950, 952–953, 2 L.Ed.2d 1001 (1958)). Only "actions which have the purpose and effect of causing the government to pay out money are clearly 'claims' within the purpose of the Act." *Lawson,* 522 F.Supp. at 750 (citing *United States v. Silver,* 384 F.Supp. 617, 620 (E.D.N.Y.1974), *aff'd,* 515 F.2d 505 (2nd Cir.1975)).

Moreover, violations of separate contracts have been found to constitute claims under the False Claims Act. For example, each of the 96 contracts was held to constitute a separate claim in *United States v. American Packing Corp.;* 125 F.Supp. 788 (D.N.J.1954). There, the defendant conspirators violated meat contracts with the Army by fulfilling them with non-conforming carcasses. Accordingly, defendants were found jointly and severally liable for 96 penalties.

■ In the instant case, defendant Genovese's contention that certain claims were not made against the United States, but rather against the Union City Board of Education, must be put to rest. He asserts that for this reason, a number of the conspirators' acts do not qualify as violations of 31 U.S.C. § 3729. This argument is without merit. Union City and its board of education applied for funds from the EDA. The funds were granted and letters of credit were provided to the Board of Education of Union City Public Works Project Construction Account. The false requests for funds made by Orlandini were paid by checks drawn on this account. Genovese claims that the money in this account was solely in the control of the Union City Board of Education, and therefore, any claims as to said funds were against the Board alone. This is not true.

Although the United States had already placed the funds in the Board of Education's bank account, the government had not relinquished control of this money because in order to use the funds, there still existed the need by the Board of Education to comply with EDA regulations and specifications. Thus, the claims made upon this account may fairly be considered claims against the United States government.

The false claims which were clearly in violation of 31 U.S.C. § 3729(a)(1) and for which defendants are jointly and severally liable, include the following:

1. March 24, 1978, payment of $153,000.
2. June 1978, advance for $100,000.
3. Change Order No. 11, Union Hill High School.
4. Change Order 408.
5. Change Orders 11–14, Union Hill.
6. Change Order 24, Union Hill.
7. September 7, 1977, offer of grant, Emerson High School.
8. September 7, 1977, offer of grant, Union Hill.
9. October 7, 1977, amended offer of grant—Union Hill.

All of the above were claims against the United States under the Act because in each instance there was a demand for money. Accordingly, each of the above-listed fraudulent claims now warrants the imposition of nine (9) statutory penalties.

In contrast, the following claims do not amount to violations of 31 U.S.C. § 3729(a)(1): [9]

1. July 31, 1979 advance for $100,000.
2. September 29, 1979 advance for $120,000.
3. November 2, 1979 advance for $120,000.

Additionally, the August 9, 1979 advance for $100,000 was deficient in that nothing was provided to show that the affidavit which was submitted with the claim was false. Also, the documents the United States refers to in claiming the August 29, 1979 advance as false were missing, causing it to fail.

---

9. The United States' brief did not provide the Court with the EDA's regulations that were allegedly violated by the defendants in making these claims. It is stated that supporting documents, applications and certifications were missing with respect to said claims. However, nothing is supplied to show that these documents were required, or that their absence renders a claim to be false.

**(b) 31 U.S.C. § 3729(a)(2): Knowing Use of a False Record or Statement to Get a False Claim.**[10] The remaining documents for which the government seeks a statutory penalty are five false quarterly reports and one false interim report. Defendant Genovese challenges three of these reports because they cannot be characterized as a demand for money. A similar challenge was presented by the defendant in *United States v. Greenberg*, 237 F.Supp. 439 (S.D.N.Y.1965). In that case, defendant Greenberg was employed as general contractor for the Department of the Navy. He was not paid for any work until he delivered a voucher for payment. It was stipulated that a voucher would not be paid until payment reports were received. Greenberg prepared 34 falsified payroll reports that were submitted to the Navy. Greenberg argued that because technically, the voucher comprised the request for money and not the payroll reports themselves, the reports did not constitute claims within the meaning of the False Claims Act. The court rejected defendant's argument. It determined that each of the 34 payroll reports was indeed a claim under the Act. Important to the decision was the fact that Greenberg knew the payroll reports were an essential element in subjecting the government to a demand for money. *Greenberg*, 237 F.Supp. at 443.

In a similar case, an application for a bank loan containing a false statement was considered a claim punishable by the False Claims Act. *United States v. Veneziale*, 268 F.2d 504 (3d Cir.1959). The loan application, by itself, did not constitute a false claim. But, because it was an essential document in inducing the Federal Housing Administration to guarantee payment of a bank loan upon which the government had to pay, the loan application was found to be a claim within the purview of the False Claims Act. The court stated, "the wrong of the defendant was an important, even an essential factor in subjecting the government to an enforceable demand for money". *Veneziale*, 268 F.2d at 505.

From these illustrations it becomes clear that the five false quarterly reports and one false interim report may properly be penalized under 31 U.S.C. § 3729(a)(3). Although each individual report did not trigger separate payments, the release of funds was predicated upon the grant agreement which required the periodic submission of accurate reports. It was a condition upon which the funds were granted. The reports were all essential elements in causing the United States to part with its money. Defendants cannot maintain that any one of these reports had no responsibility for causing the release of EDA funds. *See, e.g., United States v. Gardner*, 73 F.Supp. 644 (N.D.Ala.1947) (penalty assessed for each report submitted which contained false information where government required report to be submitted, and thereafter predicated certain actions upon it).

Accordingly, an additional six violations of the False Claims Act occurred with the submission of the aforementioned reports which necessitates the imposition of six additional statutory penalties.

**(c) 31 U.S.C. § 3729(a)(3): Conspiracy to Defraud.**[11] It is clear that the "establishment of the existence of a conspiracy [to defraud the United States] entitles the United States to recover the forfeiture provided for in the Act." *United States v. Kates*, 419 F.Supp. 846, 852 (E.D. Pa.1976). The existence of the conspiracy is a separate violation of the Act and therefore entitles the United States to a separate statutory penalty. Each participant in the conspiracy is jointly and severally liable for that one statutory penalty. *United States v. Globe Remodeling Co.*, 196 F.Supp. 652, 657 (D.Vt.1961).

In the present case, the existence of a conspiracy to defraud the United States was conclusively established in the prior criminal proceeding. Accordingly, the United States is entitled to one statutory penalty for which each of the defendants are jointly and severally liable.

**10.** *See supra* note 3 for text of § 3729(a)(2).

**11.** *See supra* note 3 for text of § 3729(a)(3).

■ Contrary to the contention of defendant Powers, this penalty could be levied even in the event that the United States suffered no actual damages. *United States v. Rohleder,* 157 F.2d 126, 129 (3d Cir.1946); *United States v. Hibbs,* 420 F.Supp. 1365, 1370 (E.D.Pa.1976), *vacated on other grounds,* 568 F.2d 347 (3d Cir. 1977).

### 3. *Conspirator Liability and Knowledge.*

Defendant Dentico raised these related issues in his brief. He denies knowledge of a great number of the separate false claims made, and denies any responsibility for them.

Judge Sarokin, in granting summary judgment as to liability on Counts I, II and III, first had to find that the requisite knowledge to satisfy 31 U.S.C. § 3729 existed. He was able to do so because the jury verdict at trial established that the defendants participated in the scheme "knowingly and with the specific intent to deceive." The issue of knowledge is one that has already been decided, therefore, and it may not be contested at this point.

Moreover, the extent of conspirator liability under the False Claims Act was recently addressed in this district. Judge Brotman, in *United States v. Heck,* Civil Action No. 86–0875, slip op. (D.N.J., filed March 26, 1987) [Available on WESTLAW, 1987 WL 49253], granted partial judgment in the amount of $632,704.74 against defendant Heck who had previously been found guilty of conspiracy to defraud the government, making false statements and mail fraud.[12] On the subject of conspirator liability, Judge Brotman wrote:

> Once liability for a conspiracy under the False Claims Act is established, each defendant conspirator is liable for a [penalty] and twice [now thrice] the government's damages for each false claim submitted pursuant to the conspiracy even if

he did not personally submit or cause the claim to be submitted. That liability is joint and several.

*Heck,* slip op. at 8–9 (citing *United States v. Cripps,* 460 F.Supp. 969, 975 (E.D.Mich. 1978); *United States v. American Packing Corp.,* 125 F.Supp. 788, 790 (D.N.J.1954); *United States ex rel. Marcus,* 41 F.Supp. 197, 218 (W.D.Pa.1941), *rev'd,* 127 F.2d 233 (3d Cir.1942), *rev'd,* 317 U.S. 537, 635 S.Ct. 379, 87 L.Ed. 443 (1943)). Judge Brotman went on to note that "[i]t is well established that a conspirator is liable for all acts done in furtherance of the conspiracy, even if he did not know the scope of the conspiracy or the identity of each member." *Heck,* slip op. at 9 (citing *Blumenthal v. United States,* 332 U.S. 539, 556–57, 68 S.Ct. 248, 256–57, 92 L.Ed. 154 (1947)).

■ Accordingly, the defendants to the present action will be held jointly and severally liable for *all* of the damages and penalties assessed against each of them. Based upon the finding of a conspiracy to defraud the government in Count I, every act in furtherance of that conspiracy may be attributed to each and every of the co-conspirators.

### 4. *Estoppel Against the Government.*

Defendant Genovese asserts that the United States is barred from the recovery of damages because it knowingly facilitated the operation of the conspiracy, had actual knowledge damages were being caused as the result of the conspiracy, and took no action to prevent the accrual of those damages. This argument is based upon the actions of Norman Reed, a government informant under the supervision of three Justice Department agents. Reed was responsible for delivering to Orlandini the fraudulent back-dated performance bonds, without which the conspiracy arguably may have been impossible. Defendant Genovese maintains that the above

---

**12.** Defendant Heck was part of a corporation that sold homes to purchasers whose mortgages were backed by HUD mortgage insurance. The purchasers of these homes obtained HUD insurance by submitting applications containing false information and documentation prepared by Heck or his co-conspirators. Heck was found legally responsible for all of the acts of his co-conspirators, including the purchasers of the homes, that were performed in furtherance of the conspiracy.

establishes affirmative misconduct on the part of the government thereby entitling him to invoke the doctrine of estoppel.

 Estoppel is an equitable doctrine invoked by the courts to preclude a party from asserting a claim or defense which is premised upon that party's wrongdoing. *Lovell Manufacturing v. Export–Import Bank of United States*, 777 F.2d 894 (3d Cir.1985). According to the Restatement, an appropriate situation in which estoppel may be applied exists:

> If one person makes a definite misrepresentation of fact to another person having reason to believe that the other will rely upon it and the other in reasonable reliance upon it does an act ... the first person is not entitled.
>
> \* \* \* \* \* \*
>
> (b) to regain property or its value that the other acquired by the act, if the other in reliance upon the misrepresentation and before discovery of the truth has so changed his position that it would be unjust to deprive him of that which he thus acquired.

Restatement (Second) of Torts § 894(1) (1979).[13] Additionally, a showing of affirmative misconduct is necessary to invoke this doctrine against the government. *Lovell*, 777 F.2d at 899. However, even where there is affirmative misconduct on the part

of the government, the traditional elements of estoppel must still be satisfied prior to the invocation of the doctrine. *Heckler v. Community Health Services, Inc.*, 467 U.S. 51, 61 n. 13, 104 S.Ct. 2218, 2234 n. 13, 81 L.Ed.2d 42 (1984).[14]

 With respect to defendants' assertion as to their change in position, respondent lost neither a legal right nor anything to which it was entitled. The inability to retain money that should have never been received is not a detriment that gives rise to estoppel. *Heckler*, 467 U.S. at 61–63, 104 S.Ct. at 2224–25. As to the issue of reasonable reliance, in *Heckler* the Supreme Court noted that reliance is inappropriate if (1) respondent had a duty to familiarize itself with the Medicare program and its accompanying legal requirements, and (2) the advice that was relied upon was informal and orally given. 467 U.S. at 64, 65, 104 S.Ct. 2225, 2226.[15]

 The instant case, when viewed in light of *Heckler*, clearly does not merit the imposition of estoppel against the government. As in *Heckler*, the detriment claimed is the inability to retain money that should never have been acquired in the first place. The reliance claimed in this case is even more inappropriate. It certainly was not reasonable for the defendants to rely upon the issuance of fraudulent bonds in breaking the law from that

**13.** The Restatement requires that: (1) the party claiming estoppel must have relied in such a manner as to change his position for the worse, and (2) reliance must have been reasonable in that the party claiming estoppel did not know nor should it have known that its adversary's conduct was misleading.

**14.** In *Heckler*, the respondent, Community Health Services of Crawford County, Inc., provided health care services to Medicare beneficiaries for which it was reimbursed under the Medicare program. Respondent received reimbursement through Travelers Insurance Company. Travelers' Medicare Manager, a government agent, advised respondent that certain employees' salaries were reimbursable under Medicare. This information was incorrect. In reliance, respondent included these costs in its cost reports to Medicare, and was fully reimbursed. Three years later, respondent sought to estop the government from recovering those funds that respondent never should have received.

Although respondent relied on the misinformation of a responsible government agent who expressly authorized its actions, estoppel was held inapplicable. The decision was based upon the determination that the traditional elements of estoppel were not present. *Heckler*, 467 U.S. at 59–66, 104 S.Ct. at 2223–2227.

**15.** In *Heckler*, Justice Stevens, in elaborating on a comment by Justice Holmes sixty years earlier, wrote:

> Protection of the public fisc requires that those who seek public funds act with scrupulous regard for the requirements of the law; respondent could expect no less than to be held to the most demanding standards in its quest for public funds. This is consistent with the general rule that those who deal with the Government are expected to know the law and may not rely on the conduct of Government agents contrary to the law.

467 U.S. at 63, 104 S.Ct. at 2225 (footnote omitted).

point forward. The government in no way lead the defendants to believe their conduct was legal; defendants were not misled.

Accordingly, in the absence of the prerequisite elements of estoppel, this Court need not reach the issue of affirmative misconduct. Additionally, this Court notes that estoppel is an equitable doctrine whose purpose is to avoid injustice. There is no indication that it would be unjust for the United States to recover the money illegally taken from it. Estoppel against the government in this case is inappropriate.

### 5. *The Government's Reliance.*

Finally, there is defendants' contention that the government never relied on the defendants' false representations, and therefore, it cannot recover damages under the False Claims Act. Defendant Genovese claimed that when Reed issued the fraudulent bond, the United States acquired knowledge that nullified the requisite element of reliance.

It appears, however, that there is a split of authority on the issue. Defendant Genovese cites a number of cases in support of his position. Many are inapposite. For example, one case concerns the Contract Settlement Act of 1944 as opposed to the False Claims Act. *United States v. Dinerstein,* 362 F.2d 852 (2d Cir.1966). And another is about the acceptance by the government of non-conforming goods. *United States v. Hangar One, Inc.,* 406 F.Supp. 60 (N.D.Ala.1975), *rev'd on other grounds,* 563 F.2d 1155 (5th Cir.1977). However, defendant does cite authority which holds that reliance is necessary under the False Claims Act. *See United States v. Robbins,* 207 F.Supp. 799 (D.Kan. 1962). *But see Lawson* (requirements for a violation of 31 U.S.C. § 3729(1) do not include reliance as a necessary element); *United States v. Ehrlich,* 643 F.2d 634 (9th Cir.1981) (specifically eliminating need for government to be deceived in order to re-cover damages under the False Claims Act).[16]

Although *Ehrlich* was decided under 31 U.S.C. § 231, the predecessor of 31 U.S.C. § 3729, the only difference between these statutes is that the former used the language "by reason of," whereas the latter version now employs the language that a party "is liable to the United States for ... damages which the government sustains *because of* the act of that person." 31 U.S.C. § 3729(a)(7) (emphasis added). If the phrase "by reason of" was not construed to imply the requirement of reliance, it is even less likely that the phrase "because of" would necessitate it. As a final note on reliance, "actual deception of the government has been held not essential to the [violation of the False Claims Act]." C.J.S. U.S. § 168, Vol. 91, p. 379 (citing *United States v. Presser,* 99 F.2d 819 (2d Cir.1938)).

Actual reliance is not essential to the recovery of damages under the False Claims Act. Whether the government relied upon the false representations of the defendants or not, it should be able to recover the money disbursed on account of those representations.

## IV. CONCLUSION

For the above-noted reasons, this Court concludes that partial summary judgment on the issue of damages for Counts I and III shall be granted against defendants William V. Musto, John J. Powers, Frank Scarafile, Gildo Aimone, Anthony Genovese, Dominich D'Agostino and Lawrence Dentico. The defendants shall be jointly and severally liable for $728,640 in addition to 16 penalties. Nine penalties were assessed for violations of 31 U.S.C. § 3729(a)(1), six were assessed for violations of 31 U.S.C. § 3729(a)(2), and one was assessed for the violation of 31 U.S.C. § 3729(a)(3). With respect to the $5,000–10,000 range which may be assessed for

---

**16.** In *Ehrlich,* a builder of subsidized housing was found to have violated the False Claims Act. He caused excess interest subsidies to be paid by HUD due to his falsification of construction costs. The court ruled against him regardless of the fact that HUD was aware that the cost figures were inflated. Although HUD knew that the cost figures were incorrect, the court found that HUD continued to incur losses by "reason of" the builder's fraudulent acts.

**180**

each of the sixteen penalties, although the Court is tempted to use the lower limit because the change in the statute enables the government to recover between two and one-half to five times the amount it originally requested, a final determination will not be made until all parties have had the opportunity to submit briefs on this issue. Said briefs to be submitted within thirty (30) days of the date of filing of this opinion.

An appropriate order is to be submitted by the United States Attorney.